J-S63034-15

COMMONWEALTH OF PENNSYLVANIA, : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
Appellee :
:
v. :
:
ZAIEE TALBERT, :
:
Appellant : No. 719 EDA 2015

Appeal from the Judgment of Sentence January 30, 2015
in the Court of Common Pleas of Philadelphia County,
Criminal Division, No(s): CP-51-CR-0009688-2012;
CP-51-CR-0009690-2012

BEFORE: DONOHUE, MUNDY and MUSMANNO, JJ.

OPINION BY MUSMANNO, J.: **FILED DECEMBER 22, 2015**

Zaiee Talbert ("Talbert") appeals from the judgment of sentence imposed following his convictions for two counts each of murder of the first degree and conspiracy.[1] We affirm.

On March 12, 2012, at approximately 8:00 p.m., Officer Timothy Stephan ("Officer Stephan") responded to a call reporting gunshots. After arriving at the scene, Officer Stephan found an all-terrain vehicle ("ATV") next to a parked van. Officer Stephan found 17-year-old Dexter Bowie ("Bowie") and 18-year-old Jonathan Stokely ("Stokely"), one on either side of the van, both of whom were unconscious and suffering from multiple gunshot wounds. Stokely was pronounced dead at the scene. Bowie was transported to Temple University Hospital, where he was pronounced dead at 8:24 p.m.

_____
[1] 18 Pa.C.S.A. §§ 2502(a), 903.

J-S63034-15

Dr. Samuel Gulino ("Dr. Gulino"), Chief Medical Examiner of Philadelphia County, ruled each death a homicide. Bowie suffered 13 gunshot wounds to the head, back, buttock, chest, abdomen, arm, thigh and foot, which caused injury to his intestine, liver and lung. Stokely suffered at least 22 gunshot wounds, 15 of which were to the legs, with others to the back, abdomen, buttock and lung. Eyewitnesses identified Talbert and Christopher Lloyd Butler ("Butler") as the shooters.[2]

Talbert and Butler were arrested, and each was charged with two counts of murder and related charges.[3] In September 2012, the Commonwealth filed a Pennsylvania Rule of Criminal Procedure 802 Notice of Aggravating Circumstances. In June 2013, the Commonwealth filed a Notice of Removal of Capital Designation. In February 2014, following a jury trial, the trial court declared a mistrial because the jury could not reach a verdict regarding the charges against Talbert.[4]

---

[2] The trial court set forth an extensive recitation of the underlying facts in its Opinion. *See* Trial Court Opinion, 4/29/15, at 2-8.

[3] Raheim Aimes ("Aimes"), who worked for Talbert at a barbershop, entered a guilty plea for a firearms possession charge arising out of the same incident, and testified for the Commonwealth at trial under a grant of immunity.

[4] Talbert was tried with co-defendant Butler. The jury found Butler guilty of two counts of murder in the first degree and one count of possession of an instrument of crime. The trial court sentenced Butler to an aggregate sentence of life in prison without parole. This Court affirmed Butler's judgment of sentence. *See Commonwealth v. Butler*, 885 EDA 2014, 2015 WL 7078269 (Pa. Super. filed November 12, 2015) (unpublished memorandum).

Following a second jury trial in November 2014, Talbert was acquitted of possessing instruments of crime, and convicted of two counts each of murder of the first degree and conspiracy. On January 30, 2015, the trial court sentenced Talbert to concurrent terms of life in prison for the murder convictions and 20-40 years in prison for the conspiracy convictions.

On February 6, 2015, Talbert filed timely Post-Sentence Motions, which the trial court subsequently denied. Talbert filed a timely Notice of Appeal and a court-ordered Pennsylvania Rule of Appellate Procedure 1925(b) Concise Statement of Matters Complained of on Appeal.

On appeal, Talbert raises the following questions for our review:

I. Whether [Talbert] is entitled to a new trial based on the ground that the trial court erred in admitting an overly prejudicial [music] video of [Talbert] singing rap lyrics[,] when the Commonwealth failed to establish that [Talbert] was the author of the lyrics and failed to establish that the lyrics, in fact, pertained to the incident in question?

II. Whether [Talbert] is entitled to an arrest of judgment on the ground that the evidence was insufficient to sustain his conviction[,] since he was found not guilty of [p]ossessing an [i]nstrument of [c]rime[,] and the only evidence linking him to the crime asserted that he was one of the shooters?

III. Whether [Talbert] is entitled to a new trial/arrest of judgment on the ground that the trial court erred in accepting an inconsistent verdict since [Talbert's] acquittal of the charge of Possessing and Instrument of Crime clearly indicated that the Commonwealth had not proven beyond a reasonable doubt that he was one of the shooters[,] and there was no additional evidence adduced that he played any other role in the crime?

IV. Whether [Talbert] is entitled to an arrest of judgment in the above-captioned matter on the ground that the verdict is against the weight of the evidence since any evidence linking [Talbert]

- 3 -

to the crime was contradicted by overwhelming evidence showing [Aimes] and [Butler] to be the shooters?

Brief for Appellant at 3-4 (renumbered for ease of disposition).

In his first claim, Talbert argues that the trial court erred in admitting as evidence a rap music video that allegedly contained lyrics describing a crime similar to the murders at issue in this case. *Id.* at 20. Talbert contends that the trial court misconstrued the meaning of the "slang" words used in the lyrics; therefore, it was impossible to conclude that the rap specifically referred to the murders in question. *Id.* at 21. Talbert asserts that the video was irrelevant and unfairly prejudicial, and that its admission into evidence entitles him to a new trial. *Id.*

Our standard of review concerning the admissibility of evidence is well settled:

> With regard to the admission of evidence, we give the trial court broad discretion, and we will only reverse a trial court's decision to admit or deny evidence on a showing that the trial court clearly abused its discretion. An abuse of discretion is not merely an error in judgment, but an overriding misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of the record.

*Commonwealth v. Flamer*, 53 A.3d 82, 86 (Pa. Super. 2012) (citations and quotation marks omitted).

"Relevance is the threshold for admissibility of evidence." *Commonwealth v. Tyson*, 119 A.3d 353, 358 (Pa. Super. 2015); *see also* Pa.R.E. 402. "Evidence is relevant if it has any tendency to make a fact

more or less probable than it would be without the evidence[,] and the fact is of consequence in determining the action." Pa.R.E. 401; *see also Tyson*, 119 A.3d at 358 (stating that "[e]vidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact.").

"The court may exclude relevant evidence if its probative value is outweighed by a danger of … unfair prejudice…." Pa.R.E. 403; *see also Commonwealth v. Kouma*, 53 A.3d 760, 770 (Pa. Super. 2012) (stating that even when evidence meets the relevance requirements, "such evidence may still be excluded where its probative value is outweighed by the danger of unfair prejudice.").

> However, [e]vidence will not be prohibited merely because it is harmful to the defendant. [E]xclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based on something other than the legal propositions relevant to the case…. This Court has stated that it is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand[.]

*Kouma*, 53 A.3d at 770 (citation omitted); *see also* Pa.R.E. 403 cmt. (defining "unfair prejudice" as "a tendency to suggest a decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially.").

Here, when Officer Stephan arrived at the scene, he found Bowie and Stokely at North 9th Street and Indiana Street, in a neighborhood that is part

of the 25th District.[5]   N.T., 11/10/14, at 53-55.   Both victims were shot more than a dozen times.  N.T., 11/13/14, at 191, 219-31.  Stokely suffered at least 15 gunshots to the legs.   *Id.* at 222.   The cartridge casings recovered at the scene included almost two dozen casings consistent with cartridges that would be used in an AK-47 assault rifle, as well as several casings that would be used in a 9-millimeter handgun.  N.T., 11/14/14, at 60-61.  Additionally, a surveillance video confirmed that the escape vehicle driven by the shooters was a van.  N.T., 11/10/14, at 203.  In March 2012, Talbert owned a blue van.  N.T., 11/13/14, at 62-63.  Two eyewitnesses also testified regarding Talbert's participation in the shooting.   *See* N.T., 11/14/14, at 334-45, 333-38; N.T., 11/13/14, at 105-06, 126-27.

On April 23, 2012, Talbert uploaded a rap music video to YouTube, which the Commonwealth argued contained lyrics that described a crime similar to the murders at issue in this case.  In the video, Talbert rapped the following lyrics:

> Running and running the Badlands like an Afghan
> Choppers on deck, slide up in the caravan
> Hit up ya legs, turn that nigga into half a man
> Things get hot and I slide down to Maryland
> Where a nigga get a bean for half a grand."

---

[5] Evidence adduced at trial established that this neighborhood is commonly referred to as the "Badlands."  *See* N.T., 11/10/14, at 171, 176; *see also* Trial Court Opinion, 4/29/15, at 10.

N.T., 11/6/14, at 7.[6]   Steven Sturgis ("Sturgis") helped Talbert record the rap song at issue over the beat of Meek Mill's "Lean Wit It."  N.T., 11/10/14, at 168.  Sturgis testified that, to his knowledge, the new lyrics were Talbert's own lyrics, and that he had either previously written them or rapped them freestyle in the studio.  *Id.*[7]  The Commonwealth introduced the music video to corroborate Talbert's role as one of the shooters through the use of his own words in the rap song.  *See* N.T., 11/6/14, at 25-27; *see also* Brief for the Commonwealth at 24.

After considering the testimony provided at trial, the trial court concluded that the portion of the lyrics of the rap song introduced at trial made particular references to the murders of Bowie and Stokely.  *See* Trial Court Opinion, 4/29/15, at 10.  Specifically, the trial court determined that the term "Badlands" is often used to refer to the neighborhood in

---

[6] The trial court excluded the following portion of the rap lyrics as irrelevant and prejudicial:

> That's bout twenty bricks, you do the math, man
> Put my tux on, lookin' like a mad man
> I just dropped thirty bundles in a trash can
> And watch my youngins be gunned in the ave, damn!

*See* N.T., 11/6/14, at 4-7; *see also* Trial Court Opinion, 4/29/15, at 9-10 n.6.

[7] Talbert does not dispute Sturgis's testimony on appeal or the trial court's finding that Talbert was the author of the lyrics.  *See* Trial Court Opinion, 4/29/15, at 9; *see also* Pa.R.E. 901 (stating that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.").

Philadelphia where the murders occurred. *See id*.; N.T., 11/10/14, at 171, 176. The trial court also found that the term "chopper" is a term used to refer to a gun. *See* Trial Court Opinion, 4/29/15, at 10; N.T., 11/10/14, at 171. The trial court further construed the term "caravan" to be a reference to the escape vehicle used by Talbert and Butler. *See* Trial Court Opinion, 4/29/14, at 10. Additionally, the trial court determined that the phrases "hit up ya legs" and "half a man" describes the injuries sustained by the victims, one of whom was shot 15 times in the legs. *See id.*

Talbert argues that the trial court's findings regarding these references are incorrect. Brief for Appellant at 20. Talbert points out that because "the Badlands" refers to an entire neighborhood rather than the precise location of the crime, the term is not specific enough to draw the inference that his raps lyrics were about the murders of Bowie and Stokely. *Id.* Talbert also claims that the use of the plural word "choppers" is inconsistent with the crime because only one AK-47 was used to shoot the victims in this case. *Id.* at 21. Further, Talbert contends that he was the owner of a Chevy Uplander, rather than a "caravan," and that the Commonwealth asserted that the Uplander was the escape vehicle. *Id.* Finally, Talbert asserts that the phrase "half a man" generally refers to someone who is paralyzed from the waist down, rather than someone who is dead. *Id.* Talbert argues that, given these inconsistencies, it would be impossible to conclude that the rap lyrics referred to the crimes in question. *Id.*

Although Talbert suggests that there are inconsistencies between the facts of the crime and the common slang meaning of the words in the rap song, we conclude that these inconsistencies are not significant enough to change the overall meaning of the rap lyrics. Referencing a neighborhood within the city of Philadelphia is not so general that the incident at issue could not properly be associated with the term "the Badlands," which is the neighborhood where the murders did, in fact, occur. The reference to the plural "choppers," rather than to a singular "chopper," is also not so transformative that a listener would not understand the general idea that the rap was meant to convey. While Talbert seems to suggest that the term "chopper" can only refer to an AK-47 assault rifle, Strugis testified that the term can be used in reference to any kind of gun. N.T., 11/10/14, at 170. Moreover, the use of the term "caravan," as opposed to the specific model name of Talbert's own vehicle, is an insignificant difference in the context of the entire rap song. Additionally, despite the fact that Sturgis had never heard the phrase "half a man" used to refer to a dead man, the phrase could reasonably be referring to the injuries sustained by the victims.

Given the painstaking efforts of Talbert to show inconsistencies between the facts of this case and his rap lyrics, it appears that he would only be satisfied if the Commonwealth had presented as evidence lyrics that read "on the night of March 12, I shot Bowie and Stokely on the 2900 block of North 9th Street using an AK-47 assault rifle." To expect rap lyrics, which

- 9 -

are a form of artistic expression, to communicate a criminal event in precise detail would be wholly unreasonable. **See, e.g., Holmes v. State**, 306 P.3d 415, 419 (Nev. 2013) (stating that "defendant-authored rap lyrics may employ metaphor, exaggeration, and other artistic devices, and can involve abstract representations of events or ubiquitous storylines. But these features do not exempt such writings from jury consideration where [] the lyrics describe details that mirror the crime charged.") (citations and quotations omitted). Taken as a whole, we conclude that Talbert's rap video is relevant to show his involvement in these murders. **See Flamer**, 53 A.3d at 89 (holding that the trial court abused its discretion by finding defendant's rap lyrics to be irrelevant and prejudicial, where lyrics about people "keeping their mouths shut," sending friends to kill for him, and "popping shells" in people that "run their mouth" had a tendency to show a conspiratorial agreement.); **see also U.S. v. Stuckey**, 253 Fed. Appx. 468, 482 (6th Cir. 2007) (concluding that rap lyrics were relevant because the lyrics concerning the killing of government witnesses was precisely what the government accused the defendant of doing).

Furthermore, while the admission of Talbert's rap music video certainly could have been harmful, there is no evidence to suggest that any resulting prejudice so inflamed the jury as to create a risk that the jury would convict on other factors. **See Flamer**, 53 A.3d at 89-90; **see also Commonwealth v. Ragan**, 645 A.2d 811, 820-21 (Pa. 1994) (holding that

- 10 -

where a defendant put his own character at issue, rap lyrics were admissible to rebut that assertion and were not outweighed by their prejudicial effect, even where the rap was not specifically related to the facts of the case); ***Commonwealth v. Abu-Jamal***, 555 A.2d 846, 858-59 (Pa. 1989) (holding that the admission of a newspaper article in which the defendant had stated that "power grows out of the barrel of a gun" was relevant to rebut character testimony that the defendant was a "peaceful and genial" man, and its relevance was not outweighed by its prejudicial effect).[8]  Indeed, the jury received two separate instructions regarding how the rap video was to be used, one immediately following the playing of the rap video, and another during closing instructions.  ***See*** N.T., 11/10/14, at 177; ***see also*** N.T., 11/18/14, at 121-22.[9]  "[W]hen examining the potential for undue prejudice, a cautionary jury instruction may ameliorate the prejudicial effect of the

---

[8]  The rule of evidence prohibiting admission of prior bad acts is not applicable here because Talbert's rap lyrics are not about a past crime, but rather the actual murders in question.  ***See Stuckey***, 253 Fed. Appx. at 482 (stating that defendant's rap lyrics were relevant because they specifically reference the precise acts he had been accused of committing).

[9]  The trial court's final instructions included, in relevant part, the following charge:

> Before you may consider this video as evidence against [Talbert], you must find the following three things:  One, that a crime was in fact committed.  Two, that [Talbert] in fact authored the lyrics.  And three, that the other lyrics [] refer to this incident.  Otherwise you must disregard this statement.

N.T., 11/18/14, at 121.

- 11 -

proffered evidence…. Jurors are presumed to follow the trial court's instructions." *Tyson*, 119 A.3d at 360.

Given the significant relevance of the rap video and the trial court's cautionary jury instruction, the rap video was properly admitted, despite the potentially prejudicial impact of artistic works. *See* Trial Court Opinion, 4/29/15, at 11 (stating that "although the lyrical content of the video was mildly graphic, its prejudicial effect did not outweigh its relevance to proving the identity of [Talbert]."); *see also Flamer*, 53 A.3d at 89-90 (holding that the prejudicial effect of the rap lyrics did not outweigh their relevance to show the defendant's contemplation of a conspiratorial agreement). Thus, we conclude that Talbert's first claim lacks merit.

In his second claim, Talbert contends that the evidence was insufficient to sustain his conviction.[10] Brief for Appellant at 17. Talbert claims that Joseph Johnson ("Johnson") and Lydia Santos ("Santos") provided contradictory testimony regarding the identity of the shooter. *Id.* at 18. Talbert also argues that Erica Holder's ("Holder") testimony that Aimes asked for baby wipes to clean gunshot residue from his hands the night of the shooting contradicts a finding that Talbert was the second shooter. *Id.* Talbert asserts that the evidence was so unreliable and contradictory that the verdict was based on mere conjecture. *Id.*

---

[10] Talbert does not specifically identify which conviction he is challenging. However, because his argument revolves around his identity as a shooter, we interpret this claim to refer to the murder convictions.

We apply the following standard of review when considering a challenge to the sufficiency of the evidence:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial the in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence.

*Commonwealth v. Melvin*, 103 A.3d 1, 39-40 (Pa. Super. 2014) (citation omitted).

In order for a jury to find a defendant guilty of murder of the first degree, "the Commonwealth must prove, beyond a reasonable doubt, that a human being was lawfully killed, that the accused was responsible for the killing, and that the accused acted with a specific intent to kill." *Commonwealth v. Pagan*, 950 A.2d 270, 279 (Pa. 2008); *see also* 18 Pa.C.S.A. § 2502(a).

> [A] specific intent to kill may be inferred from the use of a deadly weapon to inflict injury on a vital part of the body. A deadly weapon is defined as [a]ny firearm, whether loaded or

unloaded, or any devise designed as a weapon and capable of producing death or serious bodily injury, or any other device or instrumentality which, in the manner in which it is used or is intended to be used, is calculated or likely to produce death or serious bodily injury.

*Pagan*, 950 A.2d at 279 (internal citations omitted); *see also* 18 Pa.C.S.A. § 2301.

Here, the Commonwealth presented evidence that Bowie suffered 13 gunshot wounds, and Stokely suffered at least 22 gunshot wounds. N.T., 11/13/14, at 191, 219-231. The gunshot wounds suffered by both victims were inflicted on vital parts of the body including the head, chest, and lung. *Id.* at 201-10, 219-31. Dr. Gulino determined that the manner of death was homicide. N.T., 11/13/14, at 190.

Johnson, who had known Talbert for about a year prior to the incident, identified Talbert as one of the shooters in a signed statement given to police. N.T., 11/14/15, at 334-45. Johnson indicated that Talbert used an AK-47 and Butler used an automatic handgun. *Id.* at 333-38.

Curtis Stokes ("Stokes") was outside at the time of the shooting and had seen the victims drive by on the ATV. N.T., 11/13/14, at 84. On May 1, 2012, Stokes gave a statement to police in which he indicated that on the night in question he saw Talbert, Butler, and Talbert's brother on a street corner. *Id.* at 105-06. Stokes also stated that on that same evening he saw Talbert retrieve a gun from under a car. *Id.* at 120. Stokes additionally stated that, shortly thereafter, he saw all three men get into a van and drive

away in the direction of the victims. *Id.* at 126-27. About ten minutes later, Stokes heard gunshots. *Id.* at 128, 158.

Erica Holder ("Holder"), Butler's girlfriend, testified that on the night in question she picked up Aimes and Butler at the barbershop at about 8:00 p.m. N.T., 11/12/14, at 9-10. Holder stated that when Aimes got into the van, he asked for baby wipes to wipe off his hands. *Id.* at 11. Holder testified that a few days after the shooting, she saw Talbert carrying three guns wrapped in a blanket, and that he wiped off the guns using pants. *Id.* at 13-16.

A surveillance video recovered from a women's shelter located about a block and a half south of the crime scene showed a dark van pass by at 7:53 p.m., and then continue driving south. N.T., 11/10/14, at 182, 184, 199-200, 203. Less than five minutes later, police vehicles passed by the same area. *Id.* at 210.

Additionally, the Commonwealth introduced Talbert's rap lyrics to corroborate his role as one of the shooters. *See* N.T., 11/6/14, at 25-27.

Talbert presented the testimony of Santos, who knew both victims, and stated that she was near the crime scene at the time of the shooting. *See* N.T., 11/14/14, at 195. Santos testified that she heard shots, and saw two men shooting, as well as a third man at the scene. *Id.* at 196-97. In a statement given to police on April 4, 2012, Santos identified Butler as one of the shooters from a photo array. *Id.* at 203, 211. Santos was unable to

identify the second shooter, but at trial, she asserted that Talbert was not the shooter. *Id.* at 205, 209-10.

Talbert also presented the testimony of Amira Jaynes ("Jaynes"), Aimes's ex-girlfriend. Jaynes indicated that Aimes kept an AK-47 in his bedroom and a bulletproof vest under the sink. N.T., 11/17/14, at 125. Jaynes also indicated that on the night of the shooting, she saw Aimes run into the apartment and place the AK-47 under the bed. *Id.* at 124-25. Jaynes's stated that, on the night of the murders, Aimes sent a text message to Jaynes, telling her to stay away from the area in front of the barbershop. *Id.* at 126.

Here, the jury found that neither Santos nor Jaynes were credible witnesses. *See* Trial Court Opinion, 4/29/15, at 7; *see also* ***Commonwealth v. Ramtahal***, 33 A.3d 602, 607 (Pa. 2011) (stating that "the jury, which passes upon the weight and credibility of each witness's testimony, is free to believe all, part, or none of the evidence."). Accordingly, we conclude that the credible evidence of record, viewed in the light most favorable to the Commonwealth as the verdict winner, was sufficient to establish that Talbert was one of the shooters. *See Ragan*, 645 A.2d at 818 (holding that there was sufficient evidence to sustain a conviction for murder of the first degree where the Commonwealth presented eyewitness testimony identifying the killer). We further conclude that the evidence, viewed in the light most favorable to the Commonwealth,

clearly supports a finding of specific intent, inferred from the use of a deadly weapon to inflict injury on a vital part of the body. *See Commonwealth v. Smith*, 985 A.2d 886, 896 (Pa. 2009) (stating that the medical examiner's testimony regarding seven separate gunshot wounds was sufficient to allow the jury to conclude that the victim was intentionally killed). Thus, Talbert cannot succeed on his claim that there was insufficient evidence to sustain his convictions for murder of the first degree.[11]

In his third claim, Talbert asserts that his convictions of murder of the first degree are inconsistent with his acquittal of possessing instruments of crime.[12] Brief for Appellant at 19; *see also id.* at 17. Talbert claims that this inconsistency indicates that the Commonwealth did not prove beyond a reasonable doubt that he was one of the shooters. *Id.* at 19.

It is well-settled that "inconsistent verdicts are permissible in Pennsylvania." *Commonwealth v. States*, 938 A.2d 1016, 1025 (Pa. 2007).

---

[11] Furthermore, notwithstanding the evidence that Talbert was one of the shooters, there is additional evidence sufficient to support his convictions of murder of the first degree. Because the jury convicted Talbert of both murder in the first degree and conspiracy, the jury was not specifically required to find that Talbert was one of the shooters. *See Commonwealth v. Montalvo*, 956 A.2d 926, 932 (Pa. 2008) (stating that "each member of a conspiracy to commit homicide can be convicted of first-degree murder regardless of who inflicted the fatal wound.").

[12] Talbert does not specify which conviction he is challenging as inconsistent with his acquittal of possessing an instrument of crime. Based on his brief argument, we will construe his claim as a challenge to his murder convictions.

Inconsistent verdicts, while often perplexing, are not considered mistakes and do not constitute a basis for reversal. Rather, the rationale for allowing inconsistent verdicts is that it is the jury's sole prerogative to decide on which counts to convict in order to provide a defendant with sufficient punishment. When an acquittal on one count [] is inconsistent with a conviction on a second count, the court looks upon the acquittal as no more than the jury's assumption of power which they had no right to exercise, but to which they were disposed through lenity. Thus, this Court will not disturb guilty verdicts on the basis of apparent inconsistencies as long as there is sufficient evidence to support the verdict.

***Commonwealth v. Frisbie***, 889 A.2d 1271, 1273 (Pa. Super. 2005) (citations and quotations omitted). Further, "[a]n acquittal cannot be interpreted as a specific finding in relation to some of the evidence[.]" ***Commonwealth v. Miller***, 35 A.3d 1206, 1213 (Pa. 2012).

As we have already determined that there was sufficient evidence to support the jury's verdict regarding Talbert's conviction of murder of the first degree, we decline to speculate as to the reason for the jury's determination. ***See U.S. v. Powell***, 469 U.S. 57, 66 (1984) (stating that "an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake."). Thus, Talbert is not entitled to relief on this claim. ***See Commonwealth v. Stokes***, 78 A.3d 644, 650 (Pa. Super. 2013) (stating that appellant's conviction of murder of the first degree was supported by the evidence even though he was acquitted of possession of instruments of crime).

In his fourth claim, Talbert asserts that the jury's verdict was against the weight of the evidence because there was contradictory evidence presented at trial that would show Aimes and Butler were the shooters. Brief for Appellant at 16. Talbert claims that the evidence demonstrates that Aimes had access to the murder weapons, and that on the night of the shooting, asked for baby wipes to remove gunshot residue from his. *Id.* at 16-17. Additionally, Talbert alleges that Aimes was with Butler when they were arrested together. *Id.* at 17. Talbert asserts that, taken together, these facts contradict the verdict, such that the verdict shocks the conscience.[13] *Id.*

"The weight of the evidence is exclusively for the finder of fact[,] who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Johnson*, 668 A.2d 97, 101 (Pa. 1995).

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

---

[13] Talbert's argument appears to raise a claim regarding his murder convictions only, and does not raise a claim regarding his conspiracy conviction.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (citations omitted). In order for a defendant to prevail on a challenge to the weight of the evidence, "the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Sullivan*, 820 A.2d 795, 806 (Pa. Super. 2003).

Here, Talbert's requests that we re-weigh the evidence and assess the credibility of the witnesses presented at trial, a task that is beyond our scope of review. The jury, as finder of fact, had the duty to determine the credibility of the testimony and evidence presented at trial. *See Commonwealth v. Collins*, 70 A.3d 1245, 1251 (Pa. Super. 2013) (stating that "[a]n appellate court cannot substitute its judgment for that of the finder of fact."). Here, the jury found that the credible evidence identified Talbert as a shooter. *See* Trial Court Opinion, 4/29/15, at 17-18. The verdict is not so contrary to the evidence as to shock the conscience. Thus, the trial court properly denied Talbert's weight of the evidence claim.

Judgment of sentence affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/22/2015