J.A02026/16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MICHAEL S. GELSINGER, | : | |
| | : | |
| Appellant | : | |
| | : | No. 627 MDA 2015 |

Appeal from the Judgment of Sentence December 5, 2014
in the Court of Common Pleas of Dauphin County Criminal Division
at No(s): CP-22-CR-0000926-2014

BEFORE: PANELLA, STABILE, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.: **FILED MARCH 29, 2016**

Appellant, Michael S. Gelsinger, appeals from the judgment of sentence entered in the Dauphin County Court of Common Pleas after a jury found him guilty of first-degree murder,[1] attempted homicide,[2] possession of firearm prohibited,[3] and carrying a firearm without a license.[4] Appellant argues (1) the Commonwealth failed to prove he had the specific intent to kill and disprove his self-defense claim, (2) the trial court erred in denying

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(a).

[2] 18 Pa.C.S. § 901.

[3] 18 Pa.C.S. § 6105(a)(1).

[4] 18 Pa.C.S. § 6106(a).

his pretrial motion to sever Appellant's trial from his co-defendant, and (3) the verdict was against the weight of the evidence. We affirm.

We glean the factual history from the trial testimony. At approximately 1:00 a.m. on December 6, 2013, Officer Michael Rudy of the Harrisburg City Police received a report of shots fired around the 1600 Block of Thompson Street in Harrisburg. N.T, 12/1/14-12/2/14, at 40 ("Vol. I"). He arrived at 1619 Thompson Street and encountered Shawn Fox, who resided there, standing on the front porch. *Id.* at 43-44, 56; N.T., 12/3/14, at 10 ("Vol. III"). Officer Rudy observed a non-responsive female, later identified as Fox's girlfriend, Tiana Dockens ("Victim"), lying on the porch. N.T. Vol. I at 44-58. As Officer Rudy attempted to treat Victim, Fox's roommate and cousin, Justin Baxter, approached the porch "cursing, yelling," and acting "belligerent." *Id.* at 48-49, 57. Officer Rudy discovered "a very small hole" on Victim's abdomen. *Id.* at 47. Other police officers arrived, and Officer Rudy rode in the ambulance with Victim to Hershey Medical Center where she was pronounced dead. *Id.* at 49-50, 73. The Dauphin County Coroner's Office performed an autopsy that morning and concluded, "[t]he cause of death [was] a gunshot wound to the abdomen" and the manner of death was homicide. *Id.* at 91-92.

At the scene, police recovered three .380 cartridge casings that were discharged from the same firearm and five .40 casings discharged from a single Glock pistol. N.T. Vol. I at 138; N.T., 12/3/15-12/5/15, at 44-45

("Vol. IV"). Police determined the Glock belonged to Baxter. N.T. Vol. IV at 31. They believed Appellant, while a passenger in a car driven by his brother, Joseph Payne-Casiano, exchanged gunfire with Baxter resulting in Victim's death. *See id.* at 39. Moreover, a bullet recovered from Victim was determined to be "of the .380, 9-millimeter class.[5]" N.T. Vol. I at 151; N.T. Vol. IV at 45. The Glock was ultimately discovered outside of 1617 Thompson Street, and the other firearm was never recovered. N.T. Vol. IV at 5, 16, 31.

On December 11, 2013, the Commonwealth filed a criminal complaint charging Appellant with the above crimes.[6] The Commonwealth joined Payne-Casiano as a co-defendant, and charged him with murder and attempted murder.

On November 18, 2014, Appellant filed a motion for severance based on the Commonwealth's intention to introduce at trial a hand-written note by Payne-Casiano to another inmate. Appellant's Mot. to Sever, 11/18/14, at 2-4 (unpaginated). The contested portion of the note read, "1. Get at Moe see what she gone [sic] say at my bro trial, try convince her to say bull shot first." *Id.* at Ex. A. Appellant argued that under the United States Supreme

---

[5] The parties stipulated to the conclusions of the ballistics expert at trial. N.T. Vol. IV at 44-45.

[6] The Commonwealth also charged Appellant with possession with intent to deliver a controlled substance and possession of drug paraphernalia, which were subsequently withdrawn.

Court decision in **Bruton v. United States**, 391 U.S. 123 (1968), if his co-defendant declined to testify, the admission of Payne-Casiano's note would violate the Confrontation Clause of the Sixth Amendment. **Id.** The trial court held oral argument and denied the motion on November 25, 2014.

On December 1, 2014, the case proceeded to a jury trial. Victim's father, Dion Dockens, testified that at the time of the murder, he lived at 1611 Thompson Street with his wife and children; Baxter was friends with Victim and his other daughter, Monique; and Fox was Victim's boyfriend. N.T., 12/2/14, at 5-9 ("Vol II"). He testified that he did not know Appellant prior to the shooting, but he knew Payne-Casiano as a friend of Monique. **Id.** at 11-12. He explained that on the night of the shooting, he was home and heard voices outside arguing. **Id.** at 13-14. He described the shooting, in relevant part, as follows:

> When I come outside on the porch, I see a car parked . . . half in front of my house and the house next door to mines [sic]. I see . . . [Payne-Casiano] on the driver's side and [Appellant] on the passenger's side.
>
> [The Commonwealth]: Were they in or out of the car?
>
> A. They were out of the car.
>
> Q. Both of them?
>
> A. Both of them standing with the doors open. [Baxter] was behind the vehicle. My daughter Monique was standing almost by [Payne-Casiano] where he was on the driver's side. And [Victim] was standing on—by [Baxter], right beside him, almost

towards where [Appellant] was on the passenger's side.

Q.  Go on.

A.  I came down and I'm asking them what's goin' on.  And [Baxter] is saying somethin' to [Payne-Casiano] and [Payne-Casiano's] saying somethin' back to him.  I'm like, you all got to take this off my street, and after that they kept goin' on.

   Next thing I know, [Baxter] walks back behind his car, his vehicle, and you can hear the cocking of the gun.  He comes back around, and that's when [Appellant] says to him: We can light the streets up.

   I said: We're not having this here.  You're not lighting the street up here.  You all can take that somewhere else.

Q.  The initial back and forth that you started to describe with [Payne-Casiano] and [Baxter], could you make out what was going back and forth? Could you get a sense of what that was about?

A.  . . .  I couldn't understand what is was about, because first of all, you know, [Baxter] was . . . drunk.  And then [Payne-Casiano] was sayin' something'; [Appellant] was sayin' something'; my daughter was sayin' somethin'.  So you have, like, five different voices, everybody sayin' different things.  My main concern to get my daughters, you know, these guys, you know, just get off my street.

*   *   *

Q.  Were you able to get [your daughters] away?

A.  Yes.  . . . [M]e and my daughter Monique was going up to the steps into my house.  [Victim] said: Dad, I'm going to [Fox's].  Which she do[es] every night.  And that's when she proceeded to walk down towards [Fox's].

* * *

She walked down and she was on [Fox's] steps on his house, knocking on his door so that he can come and open the door for her. And me and my daughter was up on our porch. And I'm looking at her right away, because I want to make sure that she gets into the house.

Q. What's going on below with [Payne-Casiano], [Appellant], and [Baxter]?

A. [Payne-Casiano] and [Appellant] proceed to get into the car. And [Baxter's] walking around onto the curb and starts walking down towards the house, too.

* * *

Q. When [Baxter] started walking up the street, . . . you previously described him as having a gun tucked in the front waistband?

A. Yes.

Q: Did you see him remove it and have it out in his hands as he's walking away?

A: No, I didn't. He still had his hands in his pants.

* * *

Q. What could you see?

A. I could just see the sparks coming out of the side—passenger's side window. You could see the sparks coming back towards.

Q. Could you see an arm or a hand extended out of the window?

A. I could see an arm. You couldn't see, like, the physical—you couldn't see like, you know, the whole arm. You could see the firing and wherever the gun

- 6 -

was in, you could just see the firing coming out.  It was like that.

*    *    *

Q.  How many shots did you hear?

A.  Four to five.

Q.  And then what?

A.  And then, once they started firing, [Baxter] start firing his gun back.  In the process I see my daughter [Victim], which I'm thinkin' that she fell to duck or something like that.

Q.  Where did the car go?

A.  . . .  I really didn't see . . . which way it turned or whatever like that.  I just seen the car go up there.  And once I seen my daughter fall, then I didn't worry about the car anymore.

Q.  Did you see Baxter shoot back?

A.  Yes.

Q.  What happened first?  The shots from the car? Or Baxter fired?

A.  The shots from the car.

Q.  How certain are you of that?

A.  I'm a hundred and fifty percent it was the car.

*    *    *

Q.  And just to be fair, you described an arm extending and you saw sparks from the passenger window?

A.  Yes.

Q. When—and you might have said this, but I just want to make sure it's completely clear. When the two got back in the car, who went to what side?

* * *

A. They got back – [Payne-Casiano] got back in the driver's side. [Appellant] got back in the passenger's side. And they sat there. And then as [Baxter] walked past them, and that's when the car starts slowly moving up.

Q. Okay. Shots are fired from the car. Baxter returns [fire]. Car leaves Thompson Street.

A. Yes.

*Id.* at 14-35. On cross-examination, Dockens clarified that shots were fired from the car and Victim fell before Baxter discharged his firearm. *Id.* at 55, 59.

Monique Dockens testified that she met Payne-Casiano and Appellant approximately eight years before when she was in ninth grade and that she began dating Payne-Casiano in September 2013. *Id.* at 97-99. She testified Payne-Casiano had called right after midnight on December 6, 2013, and told her he was going to stop by to see her. *Id.* at 100, 116-17. In the meantime, Victim had asked her to call Baxter, and Baxter arrived at their home "very drunk." *Id.* at 101-02. Her testimony was largely consistent with her father's account: "Once the car started driving off, I seen [Appellant's] hand come out of the passenger's side and started shooting first." *Id.* at 108. She reiterated on cross-examination: "I remember it as [Appellant and Payne-Casiano] were slowly driving down. As they w[ere]

- 8 -

driving down, they got a little bit past [Baxter]. And once they got a little bit past [Baxter], they started shooting. And [Baxter] shot back." *Id.* at 154. At the time Appellant began shooting, she testified Baxter was "at the top of his steps." *Id.* at 109.

James Moffitt, an inmate at Dauphin County Prison, testified that Payne-Casiano sent him a note in prison because Payne-Casiano "wanted me to do some things for him." N.T. Vol. III at 44, 50. The Commonwealth admitted the original note into evidence and requested to publish it to the jury. *Id.* at 52-53. Prior to publishing the note, the trial court instructed the jury that it may only consider the note as evidence against Payne-Casiano and not Appellant.[7] *Id.* at 53. The Commonwealth then asked Moffitt to read the note:

> Get at Moe, see what she gone say at my bro trial.
> Try convincer her – try convince—I don't know what
> that say – try something, bull shot first.
>
> [The Commonwealth]: I'm sorry. You say you don't
> know what that word is?
>
> A. Yeah.
>
> Q. C-O-N-V-I-N-C-E?

---

[7] We note prior to Moffitt's testimony, out of the jury's presence, the trial court overruled objections by Appellant's counsel and Payne-Casiano's counsel to the admissibility of the note on hearsay and relevancy grounds. N.T. Vol. IV at 46-48. The trial court found that the note was "not an assertion for the truth." *Id.* at 48. The trial court then advised it would read the cautionary instruction before the note's admission and during the court's charge to the jury. *Id.* at 48-49. All parties agreed to the instruction. *Id.* at 48.

A. Convince.

*Id.* at 54.

After the Commonwealth rested, Appellant testified on his own behalf. He explained the event as follows:

> We got back in the car and there was a guy that was standing on the side of the street. When we pulled off, he was walking towards – he was walking down toward 17th Street. As we . . . w[ere] going past him, [I] heard a shot, and I duck my head and I returned fire.

N.T. Vol. IV at 60. He acknowledged, on cross-examination, that the bullet from his gun killed Victim, but testified it was an "accident" and his intention was to "get away." *Id.* at 87. He further testified on cross-examination by the Commonwealth:

> Q. We can agree that you shot in the direction of Justin Baxter?
>
> A. I shot in the direction where I heard the shots coming from.
>
> Q. . . . [A]nd who was in that direction?
>
> A. When we were driving off, Justin Baxter was over there.
>
> Q. Okay. When you heard shots, though, you were beyond where Baxter was?
>
> A. Yes.

*Id.* at 87-88. The essence of Appellant's defense was that Baxter fired first, and he was "in fear [for his] life, so [he] returned fire." *Id.* at 89; *see also* *id.* at 79, 87.

On December 5, 2014, the jury found Appellant guilty[8] of the above crimes, and the trial court sentenced him to life imprisonment.[9] Appellant timely filed a post-sentence motion, on December 15, 2014, challenging the weight and sufficiency of the Commonwealth's evidence. Post-Trial Mot., 12/15/14, at 1-2 (unpaginated). The trial court held oral argument on April 1, 2015 and denied the motion on April 3, 2015. Appellant timely appealed and complied with Pa.R.A.P. 1925(b). The trial court authored a responsive Rule 1925(a) opinion.

Appellant seeks review of the following issues:

> I. Whether the evidence was insufficient at trial to prove beyond a reasonable doubt that Appellant committed the crime of first degree murder and criminal attempt [to commit] murder where the Commonwealth failed to prove beyond a reasonable doubt that [Appellant] acted willfully, deliberately, or with premeditation and where the Commonwealth failed to disprove beyond a reasonable doubt that [Appellant] acted in self-defense?
>
> II. Whether the trial court erred in denying Appellant's [m]otion for [s]everance where the

---

[8] The jury found Payne-Casiano not guilty of both charges.

[9] Specifically, the trial court sentenced Appellant to life imprisonment for first-degree murder, seven to fifteen years' imprisonment for attempted murder, and five to ten years' on each firearms charge. Trial Ct. Order,12/8/14; N.T. Sentencing Hr'g, 12/5/14, at 5-6.

denial of the motion to sever Appellant's trial from the trial of his co-defendant violated Appellant's right under the Confrontation Clause of the United States Constitution and Article 1, Section 9 of the Pennsylvania Constitution, and where the denial of Appellant's motion resulted in a violation of ***Bruton v. U.S.***, 391 U.S. 123 (1968)?

III. Whether the verdict was against the weight of the evidence where the testimony presented by the Commonwealth was inconsistent regarding the details surrounding the shooting and the events taking place in the early morning of December 6, 2013, and where the Commonwealth failed to prove that Appellant was guilty of first degree murder and criminal attempt homicide where the evidence presented by the Commonwealth failed to establish that Appellant acted with malice and the specific intent to kill?

Appellant's Brief at 7.

Appellant's first issue challenges the sufficiency of the Commonwealth's evidence supporting first-degree murder. Specifically, Appellant argues the Commonwealth failed to prove he had the specific intent to commit murder. ***Id.*** at 13. He highlights his testimony that Baxter fired shots first, and he fired in response; he also argues that the testimony of Dion and Monique Dockens "does not disprove this assertion beyond a reasonable doubt." ***Id.*** at 13-14. He further argues self-defense was not disproved because "neither witness could say whether Baxter had his gun pointed at Appellant and his brother prior to the shots being fired." ***Id.*** We disagree.

The following principles guide our review over sufficiency claims:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence.

***Commonwealth v. Talbert***, 129 A.3d 536, 542-43 (Pa. Super. 2015) (citation omitted).

"To sustain a conviction for first-degree murder, the Commonwealth must prove, beyond a reasonable doubt, that a human being was unlawfully killed, that the accused was responsible for the killing, and that the accused acted with a specific intent to kill." ***Commonwealth v. Pagan***, 950 A.2d 270, 278-79 (Pa. 2008) (citations omitted).

> [A] specific intent to kill may be inferred from the use of a deadly weapon to inflict injury on a vital part of the body. A deadly weapon is defined as [a]ny firearm, whether loaded or unloaded, or any devise designed as a weapon and capable of

- 13 -

producing death or serious bodily injury, or any other device of instrumentality which, in the manner in which it is used or it is intended to be used, is calculated or likely to produce death or serious bodily injury.

***Talbert***, 129 A.3d at 543 (citing ***Pagan***, 950 A.2d at 279).

Furthermore,

When the defendant introduces evidence of self-defense, the Commonwealth bears the burden of disproving such a defense beyond a reasonable doubt. The Commonwealth cannot sustain its burden of proof solely on the factfinder's disbelief of the defendant's testimony. The disbelief of a denial does not, taken alone, afford affirmative proof that the denied fact existed so as to satisfy a proponent's burden of proving that fact.

***Commonwealth v. Rivera***, 983 A.2d 1211, 1221 (Pa. 2009) (citations and punctuation marks omitted).

The use of force in self-defense is justified under the following circumstances:

**§ 505. Use of force in self-protection**

**(a) Use of force justifiable for protection of the person.**—The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

**(b) Limitations on justifying necessity for use of force.—**

\* \* \*

(2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:

(i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

(ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.

18 Pa.C.S. § 505(a), (b)(1)-(2).

Instantly, the Commonwealth presented, *inter alia*, the testimony of Dion and Monique Dockens, eyewitnesses to the shooting. Both witnesses testified that Baxter began slowly walking home after the argument outside Dion Dockens' residence appeared to end. N.T. Vol. II at 30-31, 108. Appellant and Payne-Casiano followed him in the car they were driving, and Appellant stuck his arm out from the passenger-side window and began firing a gun. *Id.* at 31-33, 108-09. Dion Dockens testified he was "a hundred and fifty percent" certain that the first shots fired came from Appellant. *Id.* at 34. Both witnesses indicated that Baxter did not point his gun or make any aggressive movement toward the vehicle as he walked home. *See id.* at 109-10; *id.* at 32 (testifying Baxter had his hands "in his pants" and did not have his gun drawn as he walked home).

Viewing the evidence in the light most favorable to the Commonwealth, we conclude there was sufficient evidence adduced to prove Appellant had the specific intent to kill Baxter.[10] **See Talbert**, 129 A.3d at 542; **Pagan**, 950 A.2d at 278-79. The jury was free to weigh all the evidence and credit the testimony of the Commonwealth's witnesses. **See Talbert**, 129 A.3d at 543. Moreover, the jury was free to infer Appellant had the specific intent to kill when he fired his weapon at Baxter, who did not have his weapon drawn, three times. **See id.**; **see also Commonwealth v. Chine**, 40 A.3d 1239, 1242 (finding the defendant had specific intent to kill where he fired three shots at "an unsuspecting, unarmed victim who had his back to [the defendant]").

Likewise, we conclude the Commonwealth disproved Appellant's self-defense argument beyond a reasonable doubt. **See Rivera**, 983 A.2d at 1221. The testimony of Dion and Monique Dockens established that at the time Appellant fired his gun, Baxter did not have his gun drawn or take any aggressive actions toward the car. **See** N.T. Vol. II at 32, 109-110. Furthermore, even by Appellant's own testimony, at the time he alleged to have heard shots fired, he was in his vehicle "beyond where Baxter was." N.T. Vol. III at 87-88. Therefore, Appellant's use of deadly force was

---

[10] The fact that Appellant killed an unintended victim does not affect our analysis. "Pursuant to the doctrine of transferred intent, the intent to murder may be transferred where the person actually killed is not the intended victim." **Commonwealth v. Jones**, 912 A.2d 268, 279 (Pa. 2006) (citing 18 Pa.C.S. § 303(b)(1)).

unjustified because the evidence established such force was not immediately necessary for the purpose of protecting himself, and Appellant could have avoided the use of deadly force by retreating. *See* 18 Pa.C.S. § 505(a), (b)(1)-(2).

Next, Appellant challenges the trial court's denial of his pretrial motion for severance. He argues the note's admission in the joint-trial violated his right to cross-examine Payne-Casiano under the Confrontation Clause, citing the United States Supreme Court's decision in *Bruton*. Appellant's Brief at 15-19. We hold Appellant is not entitled to relief.

We first note:

> The decision whether to sever trials of co-defendants is within the sound discretion of the trial court and will not be disturbed on appeal absent a manifest abuse of discretion. The determinative factor is whether the defendant has been prejudiced by the trial court's refusal to sever his trial, and it is the burden of the defendant to establish such prejudice.

*Commonwealth v. Bond*, 985 A.2d 810, 824 (Pa. 2009) (citations omitted).

> The Confrontation Clause guarantees a criminal defendant the right to cross-examine witnesses. Ordinarily, a witness whose testimony is introduced at a joint trial is not considered a witness against a defendant if the jury is instructed to consider the testimony only against a co-defendant. This principle is in accord with the well-established presumption that jurors will abide by their instructions. In *Bruton*, however, the United States Supreme Court recognized that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the

consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." ***Bruton***, 391 U.S. at 135, []. Accordingly, the ***Bruton*** Court held that, if a non-testifying co-defendant's confession **directly and powerfully implicates the defendant in the crime**, then an instruction to the jury to consider the evidence only against the co-defendant is insufficient, essentially as a matter of law, to protect the defendant's confrontation rights.

***Commonwealth v. Cannon***, 22 A.3d 210, 217-18 (Pa. 2011) (some citations, quotation marks, and alterations omitted; emphasis added). However, "[w]hen the nontestifying co-defendant's statement does not inculpate the other co-defendant, there is no violation of the right of confrontation." ***Commonwealth v. Gribble***, 703 A.2d 426, 437 (Pa. 1997) (citation omitted), *abrogated on other grounds by* ***Commonwealth v. Burke***, 781 A.2d 1136 (Pa. 2001).

Our Supreme Court has discussed how to asses ***Bruton*** challenges:

In order to protect these rights, the Court has developed different analyses under the Confrontation Clause depending on how a statement is used at trial. For example, where a hearsay statement, given by a non-testifying declarant is offered to establish the guilt of the non-declaring defendant, the court must consider whether it was admitted pursuant to either a firmly rooted hearsay exception or contains particularized guarantees of trustworthiness. Only if the hearsay statement was admitted under such circumstances will such a statement be deemed to respect the non-declaring defendant's right of confrontation. On the other hand, where a hearsay statement is not admitted against the non-declaring co-defendant as evidence, then the court must consider whether sufficient precautions have been taken to insulate the non-

- 18 -

> declaring co-defendant from spill-over prejudice due to the admission of the hearsay statement.

*Commonwealth v. Overby*, 809 A.2d 295, 300-01 (citations and quotation marks omitted).

A statement[11] is hearsay if it is one that "the declarant does not make while testifying" **and** "a party offers in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c). Further, "[c]ommunications that are not assertions are not hearsay. These would include questions, greetings, expressions of gratitude, exclamations, offers, instructions, warnings, etc." *Id.* at cmt. In *Commonwealth v. Parker*, 104 A.3d 17 (Pa. Super. 2014), *appeal denied*, 117 A.3d 296 (Pa. 2015), this Court held "that when a question includes an implied assertion, the question constitutes a statement for the purpose of Rule 801(a). If that statement is offered for the truth of the matter asserted, it is hearsay and is generally inadmissible." *Parker*, 104 A.3d at 24.[12] "An out of court statement offered not for its truth but to

---

[11] A "'statement' means a person's oral assertion, written assertion, or nonverbal conduct if the person intended it as an assertion." Pa.R.E. 801(a).

[12] In *Parker*, the relevant testimony came from the defendant's grandmother, who testified:

> He said, **Grandmom, he said, Grandmom, Can you tell Bey I didn't take anything from anybody and I don't have anything? He said, But can you tell him I didn't take anything from him or the house.** And I said, Put Bey on the phone and I will tell him you been in the house all

explain the witness's course of conduct is not hearsay." ***Commonwealth v.***

***Rega***, 933 A.2d 997, 1017 (Pa. 2007) (citation omitted).

> This Court has long recognized that any attempt by a defendant to interfere with a witness's testimony is admissible to show a defendant's consciousness of guilt. ***See, e.g.***, ***Commonwealth v. Johnson***, 542 Pa. 384, 398–99, 668 A.2d 97, 104 (1995) (concluding that a witness's testimony that a defendant offered him a bribe not to testify at trial was admissible to show the defendant's consciousness of guilt); ***Commonwealth v. Goldblum***, 498 Pa. 455, 472, 447 A.2d 234, 243 (1982) (citing cases for the proposition that the Commonwealth may demonstrate consciousness of guilt through attempts by a defendant to intimidate **or influence** a witness).

***Commonwealth. v. Johnson***, 838 A.2d 663, 680 (Pa. 2003).

Instantly, the statement was not admitted against Appellant, and the jury was cautioned to only consider it as evidence against Payne-Casiano. ***See Overby***, 809 A.2d at 300-01. The case *sub judice* does not present a classic ***Burton*** issue in that the note is neither a confession by Payne-Casiano offered for the truth of the matter asserted, nor does it directly and powerfully implicate Appellant in the crime. ***See Cannon***, 22 A.2d at 218. The statement, itself, is not an assertion of truth; rather, it is a directive from Payne-Casiano to another inmate to influence a witness' testimony. ***See*** Appellant's Mot. to Sever at Ex. A; ***see also*** N.T. Vol. III at 54.

---

> day and you just went on the porch. And he said—I said, Where's Bey? I said put Bey on the phone.

***Parker***, 104 A.3d at 21 (emphasis in original).

Therefore, we conclude the statement is not hearsay.  *See* Pa.R.E. 801 at cmt; *Johnson*, 838 A.2d at 680.  Further, the note does not imply an assertion.  *See Parker*, 104 A.3d at 24.  It merely instructs Moffitt to "convince" a witness to testify in a manner favorable to Appellant's defense. *See* Pa.R.E. 801 at cmt;  *Johnson*, 838 A.2d at 680.  Moreover, it did not affirmatively inculpate Appellant at all because it did not assert that Appellant was actually the one who shot his weapon first.  *See Gribble*, 702 A.2d at 437.

Under the circumstances of this case, no *Bruton* violation occurred. The note, authored by Payne-Casiano and admitted as evidence against him only, was not a confession that directly and powerfully implicated Appellant. *See Cannon*, 22 A.3d at 218.  Therefore, the trial court did not abuse its discretion in declining to sever Appellant's trial based on a *Bruton* violation. *See Bond*, 985 A.2d at 824; *see also Rega*, 933 A.2d at 1017 ("Because this case did not involve hearsay, it is clearly distinguishable from those cases . . . regarding the reading of a co-defendant's confession implicating the defendant.").

Lastly, Appellant argues the verdict was against the weight of the evidence.  Specifically, Appellant argues the testimony of Dion Dockens conflicted with his prior statements and the testimony of Monique Dockens. Appellant's Brief at 20-21.  Appellant argues, "[b]ased on the evidence,

Baxter arguably fired first and Appellant returned fire." ***Id.*** at 21. We conclude Appellant is not entitled to relief.

We assess weight challenges mindful of the following:

> The weight of the evidence is exclusively for the finder of fact[,] who is free to believe all, none or some of the evidence and to determine the credibility of witnesses.
>
> Appellate review of a weight claim is a review of the exercise of discretion, not the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Talbert***, 129 A.3d at 545-46 (internal quotation marks and citations omitted). Further, "[i]n order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." ***Id.*** at 546 (internal quotation marks and citation omitted)

Instantly, Appellant's arguments rest on a reassessment of the credibility of witnesses. The jury heard the testimony and was free to credit Dion and Monique Dockens' trial testimony despite the inconsistencies. ***See***

*id.* at *8. In denying the post-sentence challenge based on the weight of the evidence, the trial court concluded:

> After reviewing Dion and Monique's testimony and the testimony provided by [Appellant] we are unable to find that [Appellant's] testimony, given the facts provided in this case, should be given greater weight than Dion and Monique's testimony. The inconsistencies between the testimony provided by Dion and Monique were not significant, both were consistent concerning the fact that [Appellant,] shot first. We therefore cannot find that the jury's verdict and their rejection of [Appellant's] testimony in favor of Dion and Monique's testimony constitutes a denial of justice.

Trial Ct. Op., 4/13/15, at 5.

We conclude the trial court properly exercised its discretion in denying Appellant's challenge to the weight of the evidence. The trial court did not find the evidence so tenuous, vague, or uncertain as to afford Appellant a new trial, and we give its determination the gravest consideration. *See Talbert*, 129 A.3d at 545-46. Accordingly, Appellant is not entitled to relief.

Based on the foregoing discussion, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/29/2016

- 23 -