J-A29001-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| TARIQ DEVON LONG | : | |
| Appellant | : | No. 1432 WDA 2017 |

Appeal from the Judgment of Sentence Entered May 15, 2017
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0001806-2017

BEFORE: BENDER, P.J.E., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.: **FILED FEBRUARY 07, 2020**

Appellant, Tariq Devon Long, appeals from the judgment of sentence of 11½-23 months' incarceration and a consecutive term of 2 years' probation, imposed after he was convicted of person not to possess a firearm ("PNPF"), 18 Pa.C.S. § 6105. Appellant challenges the weight and sufficiency of the evidence supporting his conviction. After careful review, we affirm.

The trial court only provided a severely truncated summary of the evidence produced at trial in this case, and Appellant did not produce a separate summary of the facts in his brief at all. However, the Commonwealth set forth the following detailed summary of the facts adduced at trial, which accurately reflects the record, and to which Appellant has not objected.

> The evidence presented at trial revealed the following. Shortly after 5:00 a.m. on May 11, 2014, police were summoned to the

---

[*] Retired Senior Judge assigned to the Superior Court.

intersection of Hamilton Avenue and Hale Street in the Homewood section of the City of Pittsburgh where they discovered the body of gunshot victim Jeffrey Jackson near the Art House. [N.T., 2/9/17-2/14/17, at] 43, 45-46, 69[]. The forensic pathologist's examination revealed that he had suffered six gunshot wounds, four of which were to the chest, one to the wrist and one to the armpit. *Id.* at 137-39. Two bullets were recovered from the body and one was recovered from the victim's clothing. *Id.* at 145, 147. The pathologist determined that the victim died as a result of multiple gunshot wounds to the trunk. *Id.* at 148.

Police found four 40-caliber fired casings with the same head stamp near the victim, two of the same type of casings under the victim (with one of those stuck to his clothing), and another such casing 25 feet from where the victim was lying. *Id.* at 54-55, 64, 71-72. A copper jacket bullet fragment was found near the victim and a bullet fragment was also found under his body. *Id.* at 73-75. In the early afternoon on that same day, a constable who lived on Kelly Street at the corner of Multi Way in Homewood contacted police to report that his son had discovered a gun on the ground near their house. *Id.* at 152-[]55.

Police recovered the weapon—an S&W 40 caliber [pistol]—from a small vacant, grassy lot across from the constable's home, near the intersection of Multi Way and Kelly. *Id.* at 170-71, 174, 371-72. Based on an indentation in the dirt made by the gun and the lack of footprints or tire tracks leading to it, testimony was offered that this meant the gun had been either dropped or thrown. *Id.* at 173-74. The gun was processed for DNA and fingerprints. *Id.* at 179-80.

A firearms expert examined the seven spent 40-caliber casings found at the scene, as well as the projectiles recovered during the autopsy, and determined that they all had been discharged from the recovered firearm. *Id.* at 194, 196-97. The jacket fragments found at the scene had likewise been discharged from this firearm. *Id.* at 198.

Police attempted to speak to a number of people who were on the street shortly after the shooting and were given the name of Sabrina Zellars as a possible witness.[5] *Id.* at 320-21. Ms. Zellars was brought into the station several days later on May 16, 2014, for an interview with Detectives William Fleske and Margaret Sherwood. When she arrived, Detective Fleske informed her he had heard she was present and witnessed the shooting and that

she might have been involved. *Id.* at 321. Ms. Zellars voluntarily provided a statement, which was audiotaped. (VTS[6] at 2). At the start of the interview, Detective Sherwood again informed Ms. Zellars as to the reason she was brought to headquarters and the witness acknowledged her awareness that she was not under arrest and was free to leave at any time. *Id.*

[5] Ms. Zellars was a prostitute in the Homewood area and at the time of trial, was currently in jail for that offense. *Id.* at 88, 104.

[6] The letters "VTS" at 2, refers to the Voluntary Taped Statement of Sabrina Zellars, dated May 16, 2014. Currently, this transcript is not a part of the certified record with this [c]ourt. Undersigned counsel has contacted [A]ppellant's counsel and an agreement has been made to supplement the record. Presumably, when filed, the transcripts will be found in Part II of the Docket Entries.

Ms. Zellars reported that earlier on the evening of the incident, she had seen a brown-skin male, whom she recognized as [A]ppellant, leaning against a Grand Am on Mulford Street. She said she knew him because she had previously purchased drugs from him and he lived with her friend Candace. When she saw him leaning on the car, he asked her if she had seen "Jeff." She indicated she knew which Jeff he was looking for based on an earlier incident she had heard about that took place in January outside of [A]ppellant's house after which Jeff went to jail, followed by the arrests of [A]ppellant and Candace. *Id.* at 3-5.[7]

[7] A detective and his partner responding to shots fired while working in Homewood on January 15, 2014, saw [A]ppellant and [the] victim standing face to face on the side of the road on Hamilton Avenue. When the detectives announced who they were and asked to see hands, both men turned and started to leave. At the time, the detective saw [A]ppellant grab his waistband which indicated that he was likely carrying a gun. The detective caught up to and cuffed the victim, while his partner went after [A]ppellant, who had entered Candace Black's house. Once police kicked in the door, [A]ppellant came downstairs and he followed the detective's command to put up his hands. As [A]ppellant and the victim were simultaneously placed in separate patrol cars, [A]ppellant repeatedly asked the detective if the victim was being taken to headquarters even though he had

- 3 -

been told numerous times that the victim was under arrest and being transported directly to jail. Appellant was not arrested that day. [N.T.] at 202-21, 226[]. The victim was arrested and pled [guilty] to a possession charge. *Id.* at 224. Ms. Black was subsequently arrested and placed in jail on March 9, 2014. *Id.* at 232.

Later that morning[,] at approximately 5:00, Ms. Zellars ran into Jeff, the victim, and a woman named Theresa on Hamilton Avenue. As they stood on the corner of Hamilton and Hale Street, a man wearing a black hoodie with the hood up and tied came from behind the Art House and fired a shot as he walked toward them. Ms. Zellars reported that she immediately began running down Formosa Way toward Wilkinsburg and hid on the side of a nearby building. While hiding, she heard several more shots and then saw the shooter run past her with a gun in his hand; as he ran, she said his hood came off[8] and she recognized [A]ppellant. *Id.* at 3, 5-6. She further reported that she saw him throw the gun into some grass as he ran. *Id.* at 8. Police had also presented Ms. Zellars with a photo array and she identified [A]ppellant as the shooter by circling his picture, writing[,] "He shot Jeff[,]" above it, and signing her name. *Id.* at 10-11.

[8] Ms. Zellars stated that [A]ppellant was wearing the same hoodie she had seen him wearing earlier that night. []VTS at 7[].

When testifying at trial, however, Ms. Zellars provided a version of events different from what she had reported to police in her statement given shortly after the shooting. She stated that she had known the victim for a year or two, as well as his girlfriend Theresa, because they "hung out all of the time" in Homewood. [N.T.] at 89[]. She also knew [A]ppellant and his girlfriend Candace from living in the same neighborhood; she and Candace had also gone to school together. *Id.* at 89-90. At the start, Ms. Zellars stated that she did not want to be in court testifying against [A]ppellant; the court permitted her to be treated as a hostile witness. *Id.* at 90-91, 93.

Although she conceded she had given a recorded statement[9] and testified at the preliminary hearing that she had witnessed the victim get shot, ran down Formosa and hid against a house, Ms. Zellars claimed that she had made up the story she had given to police that [A]ppellant was the shooter and that she had seen him discard the weapon. According to Ms. Zellars, she was high on

crack cocaine and scared and invented the story because the detectives told her she would be arrested for conspiracy and put in jail for life. *Id.* at 91-97, 99-101, 119, 125-26. She further alleged that the detectives gave her money to supply her drug habit if she named [A]ppellant as the shooter. *Id.* at 103-05, 107-08. She denied knowing who had shot the victim and claimed the detective told her where the gun had been found. *Id.* at 105, 112.

[9] The audio recording of Ms. Zellars statement was played for the jury. [*Id.*] at 110[].

Counter to Ms. Zellars' allegations, Detective Fleske testified that he never threatened Ms. Zellars, never told her a gun had been recovered, never provided information about the shooter[,] and never told her she was going to jail if she did not name [A]ppellant as the shooter. *Id.* at 321-23, 327. He further stated that the only money he had ever given her was $3 for a soda; no money was ever given to her in an effort to support her crack habit. *Id.* at 326-27. He said that he attempted to get her to enter witness protection but she refused. *Id.* at 325.

With regard to Detective Sherwood's conduct during the interview, Detective Fleske testified that while in his presence, she at no point gave any money to Ms. Zellars, she never threatened her, nor did she ever tell her what to say. *Id.* at 338-39. When asked to clarify whether any of this interview … took place when he was not in the room, the detective stated that he was present the "whole time she was in the interview room until the time we dropped her off…." *Id.* at 350-51.

Detective Fleske had also interviewed [A]ppellant following his arrest on November 18, 2014. *Id.* at 328. During the interview, [A]ppellant denied that he was present at the time of the shooting, alleging that he did not shoot or even know the victim. He instead claimed that he was with Ms. Black and his children that day. *Id.* at 343.

A forensic biologist from the Medical Examiner's Office testified that the DNA swab from the recovered firearm contained a partial DNA mixture profile from more than one individual. In comparing a buccal swab obtained from [A]ppellant, she stated that "no conclusions could be drawn regarding [A]ppellant as a possible contributor to the sample due to insufficient data." *Id.* at 233, 240. As a result, the data was sent to Dr. Mark Perlin, an expert in the field of DNA analysis and detection, from Cybergenetics for

additional testing using TrueAllele[,] which he explained was a statistical computer program used for the analysis and interpretation of complex DNA mixture evidence. *Id.* at 247-48, 250, 252. When asked if he determined a "match statistic interpreting [Appellant]'s DNA being on the gun," Dr. Perlin stated, "We found that a match between the handgun swab and [Appellant was] 5.17000 or five thousand seventy times more possible than a coincidental match with an unrelated African American Person…. That's the number that results when comparing his genotype and the genotype found on the firearm." *Id.* at 285, 289. He further explained that the "chance of having a match statistic of at least 5.17 thousand … if the person had not contributed [his] DNA to the handgun would be less than one in 50,000." *Id.* at 286.

Outside the jury's presence, the prosecutor offered [A]ppellant's certified prior conviction for robbery of a motor vehicle into evidence and the court admitted it in the context of only the non-jury trial proceeding. *Id.* at 311-12.

The defense presented testimony from Theresa Franklin who stated that she had been in a relationship with the victim at the time of the shooting and that they would get high together. *Id.* at 355. She stated that on the night of the incident she was "[o]ut of [her] mind" high and walking with the victim. *Id.* at 356, 361. As they approached the corner of Hamilton and Hale, the victim was approximately six feet ahead of her and she saw Ms. Zellars standing near the stop sign. Ms. Franklin then saw someone dressed all in black—pants, gloves and a hoodie with the hood up and tied—come out of nowhere and fire shots at the victim. She claimed that she was unable to see the shooter's face, nor could she tell his race, and she ran down Hamilton as soon as she heard the shots. *Id.* at 356-59, 361-62. She estimated that the shooter was her height, 5' 7" and a half, and stated that [A]ppellant, whom she knew, was shorter than her. *Id.* at 360. Ms. Franklin alleged that she did not remember the recorded statement she had given to police on November 16, 2014. *Id.* at 364. After hearing her recorded statement played in court, she testified that she did not believe police were attempting to get her to name [A]ppellant as the shooter. *Id.* at 368-69.

Commonwealth's Brief at 3-12 (some footnotes omitted).

The Commonwealth charged Appellant with one count each of criminal homicide and PNPF. Prior to trial, the court granted Appellant's motion to sever the offenses. Appellant's trial began on February 9, 2017. Appellant was simultaneously tried by the jury for the homicide offense and by the court for PNPF. The jury returned a not-guilty verdict on criminal homicide, but the trial court found Appellant guilty of PNPF. On May 15, 2017, the court sentenced Appellant to 11½-23 months' incarceration followed by 3 years' probation. Appellant filed a timely post-sentence motion, challenging, *inter alia*, the legality of his sentence[1] and the weight of the evidence supporting his conviction. On August 30, 2017, the trial court granted relief on the sentencing claim, but denied the post-sentence motion in all other respects. Immediately thereafter, the trial court resentenced Appellant to 11½-23 months' incarceration followed by 2 years' probation, with full credit for time served. Appellant filed a timely notice of appeal, and complied with the trial court's order to file a Pa.R.A.P. 1925(b) statement. The trial court issued its Rule 1925(a) opinion on January 24, 2019.

Appellant now presents the following questions for our review:

1. Whether there was insufficient evidence to convict Appellant of PNPF when the Commonwealth failed to prove that Appellant actually possessed the firearm?

2. Whether the trial court abused its discretion in failing to grant a new trial when the verdict was contrary to the weight of the evidence?

_____

[1] Appellant's legality-of-sentence claim asserted that the trial court failed to adequately credit him for time served.

- 7 -

Appellant's Brief at 6.

### *Sufficiency of the Evidence*

Appellant first asserts that there was insufficient evidence to demonstrate that he possessed a firearm. He contends that the trial court's reliance on the prior inconsistent statement by Sabrina Zellars, combined with the DNA evidence, could not establish, beyond a reasonable doubt, that he possessed the at-issue firearm.

We review a claim that the evidence was insufficient to support a conviction under the following, well-established standard of review:

> A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. 2000) (citations omitted).

In order to establish a violation of Section 6105, the Commonwealth must establish 1) actual or constructive possession of a firearm, 2) by a person prohibited from doing so. 18 Pa.C.S. § 6105(a). Appellant concedes that he is a person prohibited from possessing a firearm and, thus, he only challenges

the sufficiency of the evidence with regard to the possession element of the offense.

In rejecting Appellant's sufficiency claim, the trial court reasoned as follows:

> In looking at all of the facts of this particular case and the inferences reasonably being drawn therefrom, it is clear that the Commonwealth's evidence is more than sufficient to show that [Appellant] possessed the firearm that was used in the killing of [the victim]. When the Medical Examiner's Office was unable to make a definitive finding concerning the DNA, it turned that gun over to Cybergenetics, a company that specializes in DNA testing and evaluation. Mark Perlin, the president of that company, set forth the types of examinations that were used in developing the DNA sample from the gun and was able to conclude that there was sufficient DNA on the gun to establish that [Appellant] possessed that weapon.
>
> In conjunction with this testimony, the Commonwealth presented the testimony of Sabrina Zellars, who testified that she was at or near the intersection of Hamilton Avenue and Hale Street when she saw [Appellant] running from the scene after shots had been fired and she saw [Appellant] throw the gun into a vacant lot on Formosa Way. The gun, however, was found in a lot located on Kelly Street, approximately one block from where Zellars identified that the gun had been tossed.
>
> Zellars was interviewed by the police and eventually put her statement on tape, which tape was played for the jury on the basis that it constituted a prior statement of the witness[,] which was inconsistent with her trial testimony.
>
> At the time of trial, Zellars maintained that she was forced to testify in the manner in which she did and that the police provided her with the information as to the details of this shooting. She further maintained that the police threatened to charge her as co-conspirator in the death of [the victim] if she did not testify that [Appellant] was [the victim]'s killer. Zellars further testified that she was concerned for not only her safety, but the safety of her seven children. [Appellant] presented all of this information to the jury and it is clear that the jury did not convict [him] of the

crime of criminal homicide based upon the equivocal and inconsistent testimony of Zellars. However, this testimony, coupled with the DNA results and the reasonable inferences drawn therefrom, was more than sufficient to establish that [Appellant] possessed the firearm that was ultimately used to kill [the victim].

Trial Court Opinion ("TCO"), 1/24/19, at 5-6.

Appellant argues that by the trial court's choosing to accept as true Ms. Zellars' prior inconsistent statement regarding her observation of Appellant with a firearm following the shooting, while rejecting her recantation of that statement in-court, "Appellant's conviction for [PNPF] became a product of speculation and conjecture." Appellant's Brief at 23. We disagree.

A prior inconsistent statement can itself be sufficient to support a conviction. Prior inconsistent statements are always admissible for impeachment purposes, but also may be admitted as substantive evidence when the statement was given in reliable circumstances and where the declarant is subject to cross-examination. *See Commonwealth v. Carmody*, 799 A.2d 143, 148 (Pa. Super. 2002) (recognizing that "a prior inconsistent statement may be offered not only to impeach a witness, but also as substantive evidence if it meets additional requirements of reliability"). Here, the factfinder was permitted to use Ms. Zellars' prior inconsistent statement as substantive evidence despite her subsequent in-court recantation.

Furthermore, the trial judge, sitting as factfinder, was free to assess independently Ms. Zellars' credibility. Thus, while it may be obvious that the jury did not find Ms. Zellars' prior inconsistent statement credible for purposes

- 10 -

of Appellant's homicide trial, the trial court was in no way bound by that assessment when considering the PNPF offense. *See Commonwealth v. Yachymiak*, 505 A.2d 1024, 1026 (Pa. Super. 1986) (recognizing that "inconsistent verdicts may be rendered by a jury and that such verdicts are not grounds for a new trial or for reversal" and that the "same rule applies in nonjury trials"). In any event, it is not at all clear from the jury's verdict of acquittal on homicide that the jury rejected Ms. Zellars' prior inconsistent statement in its entirety and, thus, it may be that the verdicts are not inconsistent at all. *See Commonwealth v. Horton*, 644 A.2d 181, 184 (Pa. Super. 1994) ("[A]n acquittal cannot be interpreted as a specific finding in relation to some of the evidence.") (cleaned up). Moreover, Ms. Zellars' prior inconsistent statement was not the only evidence of Appellant's possession of firearm. The DNA evidence also linked Appellant to the gun. Even if the DNA evidence was not flawless, the combination of these circumstances constitutes sufficient evidence of Appellant's commission of the PNPF offense.

Additionally, we ascertain that the evidence in this case exceeded that which we considered in *Commonwealth v. McClellan*, 178 A.3d 874 (Pa. Super. 2018). In *McClellan*, the defendant, who was not permitted to possess a firearm, was staying at his grandmother's home with multiple other individuals, all of who were his relatives. *Id.* at 877. Police discovered a firearm in a common area of the home that had trace DNA from at least three contributors. "[A]dditional DNA testing and analyses were undertaken to

assess the relative probability that [McClellan], rather than a family member, contributed to the DNA mixture." ***Id.*** at 879.

> Of the four DNA samples taken from the gun in question, one yielded no conclusion and another, from the trigger, was more probable if it came from a relative of [McClellan]'s and two unknown, unrelated individuals than if it came from [McClellan] and two unknown, unrelated individuals.

> However, the two other DNA swab samples pointed more heavily to [McClellan]. First, it was determined that the DNA sample taken from the gun's grip was at least 384 times more probable if the sample originated from [McClellan] and two unknown, unrelated individuals than if it originated from a relative to [McClellan] and two unknown, unrelated individuals. Therefore, the laboratory concluded there was "strong support" that [McClellan] contributed to this mixture.

> Testing of the DNA sample retrieved from the gun's magazine also yielded the conclusion that the DNA sample was at least 29 times more probable if the sample originated from [McClellan] and two unknown, unrelated individuals than if it originated from a relative to [McClellan] and two unknown, unrelated individuals.

***Id.*** (footnotes omitted).

Based on that evidence, we concluded that the there was sufficient evidence to demonstrate McClellan's constructive possession of the firearm. ***Id.*** at 880. Here, similar DNA evidence was provided but, unlike in ***McClellan***, the DNA evidence was buttressed by a witness who observed Appellant holding a firearm. Thus, our decision in ***McClellan*** supports a determination that the evidence was sufficient to convict Appellant of PNPF in this case.

Accordingly, we conclude that Appellant's first claim lacks merit.

### ***Weight of the Evidence***

Appellant also asserts that the trial court abused its discretion by failing to grant him a new trial based on his claim that the verdict was against the weight of the evidence. We review a weight-of-the-evidence claim under the following, well-established standard of review:

> A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

*Widmer*, 744 A.2d at 751–52 (citations and quotation marks omitted). In order for a defendant to prevail on a challenge to the weight of the evidence, "the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Talbert*, 129 A.3d 536, 546 (Pa. Super. 2015) (citation and quotation marks omitted).

Based on Ms. Zellars' prior inconsistent statement, in combination with the appearance of Appellant's DNA on the firearm, as discussed above, the evidence pointed toward Appellant's possession of a firearm. Although the evidence in this case was not overwhelming, the verdict still falls far short of

'shocking the conscience' of this Court and, thus, we ascertain no abuse of discretion by the trial court in its reaching the same conclusion.

Judgment of sentence **affirmed**.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/7/2020