J-S20009-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| FRANCOIS HENDERSON, | |
| Appellant | No. 1383 MDA 2017 |

Appeal from the Judgment of Sentence Entered  on September 27, 2011
in the Court of Common Pleas of Berks County,
Criminal Division at No(s): CP-06-CR-0004125-2010.

BEFORE:  GANTMAN, P.J., OTT, J. and KUNSELMAN, J.

MEMORANDUM BY KUNSELMAN, J.:                    **FILED MAY 31, 2018**

Francois Henderson appeals from the judgment of sentence entered after a jury convicted him of third-degree murder, possessing a firearm without a license, possessing an instrument of crime, and possession of a controlled substance with intent to deliver.  Henderson appeals the trial court's denial of his claims that the verdict was against the weight of the evidence.  Upon review, we affirm.

The facts as summarized by the trial court, and previously adopted by a panel of this court, are as follows:

> On the evening of August 26, 2007, Chauncey Pringle was fatally shot outside of the Bookbindery Apartments in the city of Reading, Berks County. [Henderson] and David Troy Johnson were charged with homicide in connection with Mr. Pringle's murder. Latoya Aponte testified that on August 26, 2007 at approximately 8:00 p.m., Mr. Pringle visited her apartment located at the Bookbindery Apartments to watch a television show.  She had known the victim for only a few weeks and the

two were friends. Ms. Aponte testified that while she was watching television with Mr. Pringle, she received several telephone calls from David Troy Johnson. According to Ms. Aponte, Johnson repeatedly asked about Mr. Pringle and tried to confirm that he was present in the apartment. In an attempt to stop the phone calls and persuade Johnson to leave the area, Ms. Aponte met Johnson outside of the Bookbindery Apartments. After a short conversation, Ms. Aponte returned to her apartment. She observed Johnson walk in the direction of the parking lot's exit.

At approximately 9:00 p.m., after the television show ended, Mr. Pringle and Ms. Aponte left the apartment to go to the comer tavern. When Ms. Aponte exited the building, she saw Johnson and another person she knew as 'Rose,' later identified as [Henderson], sitting on a nearby bench. Johnson and Pringle started conversing about giving each other alleged 'looks' and 'stares.' At the same time, Ms. Aponte observed [Henderson] edging around a parked car in Pringle's direction. When [Henderson] was approximately four to six feet away from Pringle, Ms. Aponte testified that she saw [Henderson] point a handgun at Mr. Pringle. Mr. Pringle held his hands up and began to retreat away from [Henderson] toward Fourth Street. Ms. Aponte testified that she turned and ran for the safety of her apartment building. Ms. Aponte heard several shots but did not see what happened to Mr. Pringle. She later learned that Mr. Pringle had become the victim of a homicide.

At approximately 11:30 p.m., Reading Police responded to the 100 block of North Fourth Street for reports of a shooting. The body of Chauncey Pringle was discovered in front of 122 North Fourth Street. Mr. Pringle was unresponsive and laying in the middle of the street. Emergency medical services personnel responded to the scene, but Mr. Pringle was pronounced deceased at 12:10 a.m. on August 27, 2007 in the Reading Hospital Emergency Room.

Police recovered $68,900 in cash from the victim's body as well as three cell phones and a Ruger P90 handgun. Evidence technicians photographed and collected several bullet casings and projectiles from the parking lot of the Bookbindery Apartments. These items were later submitted to the Pennsylvania State Police Crime Laboratory for analysis.

An autopsy of the victim was performed by pathologist Neil Hoffman, M.D. on August 27, 2007. Dr. Hoffman testified that the cause of the victim's death was 'perforation of bifurcation of the aorta due to gunshot wound to the abdomen.' Dr. Hoffman was unable to recover ballistics evidence from the body, as the projectile entered the right side victim's body and exited the left side.

Police spoke with residents of the Bookbindery Apartments, including Ms. Aponte, and identified [Henderson] as a person of interest in Mr. Pringle's death. Officers received information that [Henderson] was staying with a girlfriend at 511 North Court. On August 28, 2007, Reading Police located [Henderson] at that residence and took him into custody. After receiving consent to search the room where [Henderson]'s [sic] was arrested, police found a .45 caliber semi-automatic Sig Sauer handgun, additional .45 caliber rounds and twenty-nine (29) baggies of suspected crack cocaine. The evidence was secured and submitted to the Pennsylvania State Police Crime Laboratory for analysis and comparison with the items recovered from the Pringle homicide.[FN]

_____

[FN] Forensic Scientist James DiFlorio of the Pennsylvania State Police Crime Lab testified that the substance inside the baggies tested positive as cocaine and weighed 2.17 grams. N.T. at 189. Criminal Investigator John Lackner of the Reading Police Department was qualified as an expert witness in the area of illegal drug trafficking and opined that the 29 baggies were possessed by [Henderson] with intent to distribute and not for mere possession.

On December 4, 2007, Officer Christopher Dinger of the Reading Police Department recovered a Heckler & Koch .45 caliber semi-automatic handgun while assisting another officer in the arrest of David Troy Johnson. In a search incident to arrest, officers also recovered a fully-loaded [sic] magazine containing .45 caliber rounds from Johnson's pocket. These items were also submitted to the Pennsylvania State Police Crime Laboratory for testing and comparison to evidence found at the scene of Mr. Pringle's homicide.

Sergeant Kurt Tempinski of the Pennsylvania State Police was qualified by the court as an expert in the area of firearms and toolmark examination. Sgt. Tempinski explained to the jury the

various tests that he performed on the ballistics evidence recovered from the shooting of Chauncey Pringle, including all three firearms involved in the incident as well as the shell casings, projectiles and bullet fragments. Sgt. Tempinski found that each firearm was operable and capable of firing the appropriate ammunition. Sgt. Tempinski testified that one of the casings (T-4) and a projectile (K-2) were fired from the Sig Sauer allegedly possessed by [Henderson] and used on August 26, 2007. Additionally, another projectile (K-4), though too damaged for a conclusive match, was consistent with having been fired from [Henderson's] Sig Sauer or the victim's Ruger P90.

The projectile marked as K-2, referred to by Tempinski as a 'discharged metal-jacketed bullet' or 'lead bullet core,' was significantly less damaged than the other fragments. When asked to explain this difference, Sgt. Tempinski opined '[I]t's been my experience that sometimes when bullets pass into soft tissue of a human being, that they remain pristine and intact.'

[Henderson] took the stand in his own defense and asserted that Mr. Pringle was the first to show a weapon and begin shooting. [Henderson] testified that, when he observed a gun in the victim's waistband, he drew his own firearm and told Mr. Pringle to 'stop reaching.' [Henderson] stated that Mr. Pringle 'started backing up screaming for help. He said - help they trying to kill me.'

[Henderson] admitted on cross-examination that on August 26, 2007, he possessed the Sig Sauer .45 caliber firearm, concealed on his person, without a valid license. [Henderson] also explained that he did not believe his life was threatened until Mr. Pringle allegedly began shooting. [Henderson] stated that he was not trying, to intentionally kill the victim, but 'trying to back Mr. Pringle off me.' However, [Henderson] admitted that he drew his firearm first and held it on Mr. Pringle, as he believed that Pringle was 'reaching' for a concealed weapon. After the shooting, [Henderson] and Johnson fled the area.

*Commonwealth v. Henderson*, 492 MDA 2013 unpublished memorandum

at 1-5 (January 31, 2014) (citations omitted).

On September 8, 2011, a jury found Henderson guilty of third-degree murder, possessing a firearm without a license, possessing an instrument of crime, and possession of a controlled substance with intent to deliver,[1] but acquitted him of first degree murder and conspiracy to commit criminal homicide.[2] On September 27, 2011, the trial court sentenced him to an aggregate term of 28½ to 57 years imprisonment.

From this judgment of sentence, Henderson filed a notice of appeal with this Court on October 27, 2011. The appeal was dismissed, however, based upon Henderson's counsel's failure to file the required docketing statement. Henderson filed a timely PCRA petition, which resulted in the reinstatement of his direct appeal rights. A panel of this Court affirmed Henderson's judgment of sentence. *Id.* at 10.

On October 24, 2014, Henderson filed another *pro se* PCRA petition raising ineffectiveness of trial counsel for failure to preserve weight of the evidence claims in his post-sentence motion. Counsel was appointed to represent Henderson on his PCRA. With the agreement of the Commonwealth, relief was granted in the form of reinstatement of Henderson's post-sentence and direct appeal rights with respect to his weight claims. Henderson filed a post-sentence motion on March 31, 2017, which was denied by operation of law on August 2, 2017. Henderson

---

[1] 18 Pa.C.S.A. §§ 2502(c), 6106(a)(1), 907(b); 35 P.S. § 780-113(a)(30).
[2] 18 Pa.C.S.A. §§ 2502(a), 903.

- 5 -

appealed again, filing his Notice of Appeal on August 31, 2017. Henderson complied with the trial court's directive to file a concise statement of errors complained of on appeal. Thereafter, on October 23, 2017, the trial court issued its Rule 1925(a) Opinion. This matter is now before the court.

On appeal, Henderson raises the following issues for our review:

A. The trial court erred in denying [Henderson's] post-sentence motion where all of the verdicts were against the weight of the evidence as it is clear from the record that no witness was able [to] affirmatively identify [Henderson] as the perpetrator.

B. The trial court erred in denying [Henderson's] post-sentence motion where all of the verdicts were against the weight of the evidence as it is clear from the record that no physical evidence was presented by the Commonwealth to affirmatively establish [Henderson] as the perpetrator where the Pennsylvania State Police testified that any potential DNA evidence on the projectile from [Henderson's] handgun was washed away prior to being tested and therefore it could not be determined if the projectile from [Henderson's] handgun came into contact [with] the victim's body.

C. The trial court erred in denying [Henderson's] post-sentence motion where all of the verdicts were against the weight of the evidence as it is contrary to justice to believe that the jury and the trial court found credibility in most, if not all of the testimony of Latoya Aponte, witness for the Commonwealth, for the following reasons:

   1. That it is clear from the record that Ms. Aponte could not have seen [Henderson] sufficiently enough to be able to affirmatively identify him as the perpetrator because it was nighttime and the area was poorly lit;

   2. That is clear from the record that the trial testimony of Ms. Aponte, the only witness to the incident, was the product of an admitted liar; and,

3. That it is clear from the record that Ms. Aponte did not see [Henderson] fire his weapon as she had turned her back on the situation and had run into her residence.

Henderson Brief at 5 (unnecessary capitalization omitted). All of Henderson's issues challenge the weight of the evidence.

The Pennsylvania Supreme Court has set forth the following standard of review for weight of the evidence claims:

The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support. **Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.**

\* \* \*

A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

\* \* \*

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. **Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.**

*Commonwealth v. Clay*, 64 A.3d 1049, 1054–55 (Pa. 2013) (citations omitted) (emphasis added).

In order for a defendant to prevail on a challenge to the weight of the evidence before the trial court, "the evidence must be 'so tenuous, vague and uncertain that the verdict shocks the conscience of the court.'" ***Commonwealth v. Sullivan***, 820 A.2d 795, 806 (Pa. Super. 2003) (citations omitted). "Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing the trial court's determination that the verdict is [or is not] against the weight of the evidence." ***Commonwealth v. Talbert***, 129 A.3d 536, 546 (Pa. Super. 2015) *appeal denied*, 138 A.3d 4 (Pa. 2016). Absent an abuse of discretion the trial court's decision will not be disturbed." ***See Commonwealth v. Griffin***, 515 A.2d 865, 869 (Pa. 1986).

Initially we note, as pointed out by the Commonwealth, that, although Henderson acknowledged application of the abuse of discretion standard by this Court, he does not specify how the trial court so abused its discretion. Rather, he asks this Court to reassess the credibility of the eyewitnesses and reweigh the testimony and evidence presented at trial. In view of the foregoing standard, it is clear that we cannot. Notwithstanding this, our review of the record and consideration of the trial court's rationale for concluding that the verdict was not so contrary to the evidence as to "come as a shock to [the] court", and, thus, denying Henderson's motion, reveals no abuse of discretion.

Henderson first claims that the jury's verdict was against the weight of the evidence because no witness directly identified him as the shooter. He argues a proper reweighing of the evidence would reveal this.

In reaching its conclusion that the verdict was not against the weight of the evidence, the trial court stated that, although no one directly identified Henderson as the shooter that killed Mr. Pringle, the circumstantial evidence presented at trial clearly would allow the jury to conclude that Henderson killed Mr. Pringle. *See* Trial Court Opinion, 10/23/17, at 7. It is well established that the Commonwealth may meet its burden of proof wholly with circumstantial evidence. ***Commonwealth v. Craybill***, 926 A.2d 488, 490 (Pa. Super. 2007).

Henderson admitted to being at the scene that night. An eyewitness saw Henderson point his gun at Mr. Pringle. Henderson himself admitted shooting his gun at Mr. Pringle. A Sig Sauer casing and projectile, which likely passed through human tissue, was found at the scene. At the time of his arrest, Henderson had a Sig Sauer in his possession. No evidence was presented that his counterpart, Johnson, had a gun on him that evening. His claim that no one identified him as the perpetrator fails.

Henderson next claims that the sole eyewitness to the shooting, Latoya Aponte, was not credible, for several reasons, and therefore, the verdict was contrary to the weight of the evidence. The trial court's review of the record recognized that, despite some weaknesses in Ms. Aponte's testimony, it was within the province of the trier of fact to weigh the

credibility of the witnesses and to believe all or part, or none of their testimony, including Ms. Aponte's. ***See Commonwealth v. Zingarelli***, 839 A.2d 1064, 1069 (Pa. Super. 2003). The trial court concluded that the jury believed all or some of Ms. Aponte's testimony in reaching their verdict. ***See*** Trial Court Opinion, 10/23/17, at 10. Thus, Henderson's challenge to Ms. Aponte's credibility fails.

Lastly, Henderson claims that the jury's verdict was against the weight of the evidence because there was no physical evidence to affirmatively establish him as the shooter. The DNA evidence on the projectile from Henderson's gun was washed away prior to testing. Therefore, it could not be determined that it came into contact with Mr. Pringle. Moreover, Henderson claims, the destruction of such potentially exculpatory evidence dictates a new trial.

In addressing this issue, the trial court concluded that DNA evidence was not necessary to conclusively establish guilt. The Commonwealth presented other physical and circumstantial evidence, which taken together, made a strong case in support of the jury's finding of guilt. We agree. Henderson's claims regarding the absence of physical evidence also fail.

In sum, the trial court's conclusion, that the verdict was not so contrary to the evidence so as to shock the conscience of the court, was supported by the record in this case. We, therefore, find that the trial court properly exercised its discretion, and affirm Henderson's judgment of sentence.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 05/31/18