J-A03042-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANEUDI RODRIGUEZ | : | |
| | : | |
| Appellant | : | No. 706 EDA 2024 |

Appeal from the Judgment of Sentence Entered November 9, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0006841-2021

BEFORE: STABILE, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY LANE, J.: **FILED APRIL 14, 2025**

Aneudi Rodriguez ("Rodriguez") appeals from the judgment of sentence

imposed following his conviction for aggravated indecent assault.[1] We affirm.

The trial court provided the following relevant factual history:

> At trial, the Commonwealth presented the testimony of the victim ("A.T."), the victim's mother, Allison Denman of the Philadelphia Sexual Assault Response Center, Philadelphia Police Officer Antonio Dorman, Philadelphia Police Detective Mark Webb, and Dr. Michael Coyer as an expert in forensic toxicology. . . .
>
> [In] 2021, [twenty-eight-year-old] A.T., . . . was visiting Philadelphia to attend a friend's baby shower. [N.T.,] 7/18/23[,] at 41, 44-45. . . . A.T. made plans to stay at her mother's house . . . that evening. *Id*. at 44-45. At the time, A.T.'s mother was married to [Rodriguez], who stayed at the home periodically. *Id*. at 43, 46-47, 121, 124. A.T.'s uncle also lived at the home. *Id*. at 46.
>
> A.T.'s mother's house had two floors. *Id*. at 45-46. A.T.'s uncle, who was a heavy smoker, generally stayed and slept on the

_____

[1] **See** 18 Pa.C.S.A. § 3125(a)(1).

first floor. *Id*. at 47-48. The upstairs floor had three bedrooms and a bathroom. *Id*. at 46. A.T., who suffered from cystic fibrosis and had undergone a double-lung transplant in 2018, was sensitive to smoke and could not sleep on the first floor without compromising her health. *Id*. at 41, 48, 125. The only one of the three bedrooms upstairs that contained a bed and was habitable was the middle bedroom, where A.T.'s mother generally slept. *Id*. at 46.

[That evening], A.T. had expected to sleep in the middle bedroom together with her mother. *Id*. at 51. However, upon arriving at the house, A.T. was upset to learn that [Rodriguez] would be staying in the house that night and would be sleeping in the same bed as A.T. and her mother. *Id*. As they went to bed, A.T. went to sleep on the left side of the bed, [Rodriguez] was on the right side, and A.T.'s mother was in the middle. *Id*. at 50-51.

At approximately 2:30 a.m., A.T.'s mother woke up feeling cramped and uncomfortable while lying in the middle of the bed between her daughter and [Rodriguez]. *Id*. at 125-27. A.T.'s mother then got up and sat at the end of the bed. *Id*. at 126. Eventually, [Rodriguez] also woke up and told A.T.'s mother that she should come lie back down. *Id*. at 127. A.T.'s mother then switched positions with [Rodriguez], who moved to the middle of the bed, and went back to sleep. *Id*.

Later that morning, A.T. woke up when she felt a hand down her pants and inside of her vagina. *Id*. at 52. Initially, A.T. thought that she was having a dream[, as she "usually [had] very vivid dreams."] *Id*. at 53. As A.T. was waking up while facing away from the bed towards the wall, she felt the hand pull away. *Id*. at 53-54. A.T. was shocked and confused. *Id*. at 54. At the time, A.T. thought that her mother was still lying beside her. *Id*. When A.T. felt a hand patting her leg, she thought her mother was patting her leg. *Id*. Next, A.T. felt her pants being pulled down and realized that someone was putting their penis inside of her vagina. *Id*. As she realized what was happening, A.T. felt frozen and in a state of shock, thinking to herself repeatedly, "This isn't happening to me." *Id*. at 54-55, 64. She felt unable to tell [Rodriguez] to stop or to push him away because she was in shock. *Id*. at 98. Eventually, A.T. was able to move and turn on a lamp before throwing off the covers. *Id*. at 55-56. A.T. then began screaming and cursing as she watched [Rodriguez] pull his pants up. *Id*. a 56. After pulling up his pants, [Rodriguez] jumped

out of the bed as A.T. was screaming that he had raped her. *Id*. at 56-57. [Rodriguez] responded, "My dick wasn't even hard." *Id*. at 57, 130.

A.T.'s mother told [Rodriguez] to leave the room. *Id*. at 130. After grabbing his shoes and some clothes, [Rodriguez] ran down the stairs and left the house. *Id*. at 58. A.T. proceeded to call 911 at approximately 4:40 a.m. *Id*. at 57-59; Commonwealth Exhibit C-2 at 00:00-00:10. During the call, A.T. stated, "My mom's husband stuck his penis in me when I was sleeping. He was trying to have sex with me." Commonwealth Exhibit C-2 at 00:32-00:50. Police then arrived at the house and transported A.T. to the Special Victims Unit of the Philadelphia Police Department, where she gave a statement and was examined by a nurse with a rape kit. N.T.[,] 7/18/23[,] at 60-61; N.T.[,] 7/19/23[,] at 10. The nurse took swabs from A.T.'s cheek and from her vulva, vagina, and cervix. N.T.[,] 7/18/23[,] at 61-62; N.T.[,] 7/19/23[,] at 27-28.

A urine sample taken from A.T. during the sexual assault examination was later analyzed by Dr. Michael Coyer, an expert in forensic toxicology. N.T.[,] 7/18/23[,] at 138-39, 142, 144-45; Commonwealth Exhibit C-20. Dr. Coyer testified that A.T.'s urine sample tested positive for [numerous substances] consistent with and indicative of an intake of multiple central nervous system agents which may have included Benadryl, Suboxone [which A.T. had a prescription for], a benzodiazepine anti-anxiety medication such as Valium, and cough syrup. N.T.[,] 7/18/23[,] at [97, ]146, 148-152; Commonwealth Exhibit C-20 at 1-3. [Dr. Coyer clarified that any prescription medications taken by A.T. would affect these results. *See id*. at 151.] The test did not detect a toxicologically significant concentration of alcohol or of any other narcotics or scheduled substances. Commonwealth Exhibit C-20 at 3. Dr. Coyer concluded that it would not be possible to conclude from the urine sample whether A.T. had been impaired by any medications that she had taken. N.T.[,] 7/18/23[,] at 149, 153.

Forensic testing indicated that the vulvar swab taken from A.T. contained male biological matter. N.T.[,] 7/18/23[,] at 172-73; Commonwealth Exhibit C-21. A DNA analysis revealed that it was 10.19 billion times more likely that the DNA mixture from the vulvar swab originated from A.T. and [Rodriguez] than from A.T. and one random unrelated individual in the Hispanic population. N.T.[,] 7/18/23[,] at 173. . . .

[At trial, Rodriguez did not testify in his own defense or dispute that he inserted his penis into A.T.'s vagina. Instead, his counsel argued to the jury that A.T. consented to having intercourse with Rodriguez.]

Trial Court Opinion, 5/3/24, at 2-5.

Following a multi-day trial, a jury convicted Rodriguez of aggravated indecent assault. On November 9, 2023, the trial court sentenced him to a term of four to eight years' imprisonment, followed by a three-year probationary term.[2] Rodriguez filed a timely post-sentence motion in which he argued, *inter alia*, that the verdict was against the weight of the evidence. The trial court denied the motion. Rodriguez filed a timely notice of appeal, and both he and the trial court complied with Pa.R.A.P. 1925.

Rodriguez raises the following issue for our review:

Did the lower court abuse its discretion when it denied [Rodriguez's] post[-]sentence motion for a new trial, since the guilty verdict on aggravated indecent assault . . . was so contrary to the weight of the evidence as to shock one's sense of justice, where [A.T.'s] testimony was vague, inconsistent and unreliable regarding non-consent, especially considering [her] video-recorded admission that she allowed the sexual episode to "play out?"

Rodriguez's Brief at 3 (unnecessary capitalization omitted).

Rodriguez argues that the trial court abused its discretion in denying his claim that the verdict was against the weight of the evidence. As our Supreme Court has explained:

_____

[2] The trial court additionally required Rodriguez to register as a tier III sex offender pursuant to the Sexual Offender Registration and Notification Act ("SORNA II"). *See* 42 Pa.C.S.A. §§ 9799.10-9799.75.

A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice."

***Commonwealth v. Widmer***, 744 A.2d 745, 751-52 (Pa. 2000) (citations and footnote omitted). The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none, or some of the evidence and to determine the credibility of the witnesses. ***See Commonwealth v. Talbert***, 129 A.3d 536, 545 (Pa. Super. 2015). Thus, in order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the trial court. ***See id***. at 546.

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

Appellate review of a weight claim ***is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence***. Because the trial judge has had the opportunity to hear and see

the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (citations omitted, emphasis in original).

Rodriguez argues the verdict was against the weight of the evidence because A.T.'s testimony regarding her lack of consent was fundamentally unreliable. Initially, he argues the trial court did not adequately consider the fact that A.T. had a history of vivid dreams, and that she "ingested a combination of potentially mind-altering" medications the night of their encounter which may have impaired her senses. Rodriguez's Brief at 14.

Rodriguez additionally argues the court did not address A.T.'s contradictory testimony. He claims that although A.T. denied she was "OK" with the sleeping arrangements at trial, evidence showed "she told police that she was comfortable sleeping near [Rodriguez] but with her mother in the middle as a buffer." *Id*. at 18. Similarly, he contends that although A.T. testified she was unaware that Rodriguez and her mother switched places in the middle of the night, he maintains that A.T. told police that both she and Rodriguez suggested this switch. Lastly, Rodriguez emphasizes that both A.T. and her mother erroneously testified that A.T. never told police that she wanted to allow the incident to "play out." *Id*. at 19. On recross, he maintains

A.T. conceded that she did "tell her mother that she wanted to let things 'play out,' not only . . . to confirm whether she was dreaming, but also 'to see how far [Rodriguez] would go[.]'" *Id*.

Finally, Rodriguz claims there was no evidence corroborating A.T.'s alleged lack of consent. Specifically, he argues that both A.T.'s mother's testimony and the 911 call recording only corroborate the fact that A.T. "jumped out of bed and made a rape allegation" and not that A.T. did not consent in the moment. *Id*. at 21. Further, he maintains "[t]he DNA evidence corroborates only that sexual intercourse occurred between" him and A.T., which he never disputed. *Id*. Accordingly, Rodriguez contends that because the prosecution presented no evidence to corroborate A.T.'s testimony that the sex was nonconsensual, the lower court abused its discretion by not properly accounting for the likelihood that A.T. "consented to sex and then immediately and understandably regretted it[.]" *Id*. at 22.

The trial court considered Rodriguez's weight challenge and concluded that it lacked merit. The court reasoned:

> . . . A.T.'s testimony at trial was not only clear and credible, but it was corroborated by the testimony of her mother, the recording of her 911 call, and DNA testing. Moreover, the record shows that A.T. did not use the term "play out" during her videotaped interview in a manner suggesting that she had consented to sexual activity with [Rodriguez]. She initially explained to police, "I'm not letting this happen just like to let it happen, I'm trying to see if this is really happening. I'm like, in shock." She went on to explain that she thought she was still sleeping next to her mother, and further stated, "In my head I was like, how is [Rodriguez] physically reaching, so that's why I was letting it play out because I wanted to make sure it did happen." She further

explained at trial that she initially thought she was dreaming when she felt a hand in her vagina.  When viewed in context with A.T.'s other statements and testimony, A.T. clearly used the term "play out" in an attempt to explain her initial uncertainty about what was happening to her as she was waking up at the time of the assault and not as an expression of consent.

In light of overwhelming evidence of [Rodriguez's] guilt, the verdict was not contrary to the weight of the evidence, and the court did not abuse its discretion in denying [Rodriguez's] post-sentence motion for a new trial.

Trial Court Opinion, 5/3/24, at 10-11 (citations and unnecessary capitalization omitted).

Based on our review, we discern no abuse of discretion by the trial court in denying Rodriguez's challenge to the weight of the evidence.  As explained above, this Court will give the gravest consideration to the findings and reasons advanced by the trial court judge when reviewing its determination as to whether the verdict is against the weight of the evidence.  *See Clay*, 64 A.3d at 1055.  Moreover, one of the least assailable reasons for denying a new trial is the lower court's conviction that the verdict was not against the weight of the evidence.  *See id*.

Here, Rodriguez is essentially asking this Court to reweigh the evidence to determine that A.T.'s testimony lacked credibility and should have been accorded no weight by the jury.  This, we cannot do.  *See Talbert*, 129 A.3d at 545 (holding that the weight to be accorded to the evidence and testimony presented at trial was exclusively for the jury, which was free to believe all, part, or none of the evidence and testimony and to determine credibility).

- 8 -

Rather, this Court's role is to review the exercise of discretion by the trial court in ruling on the weight claim. In this regard, we discern no abuse of such discretion.

Initially, we emphasize that in considering Rodriguez's weight challenge, the trial court considered A.T.'s testimony in light of her history for vivid dreams, her urine-analysis results which were positive for medications, and the alleged inconsistencies in her testimony. In doing so, the court concluded that A.T.'s testimony that Rodriguez raped her was both clear and credible. As to Rodriguez's claim that there was no evidence to corroborate A.T.'s assertion that she did not consent to having intercourse with him, the trial court noted that no such corroboration was necessary. **See** Trial Court Opinion, 5/3/24, at 6; **see also Commonwealth v. Cramer**, 195 A.3d 594, 602 (Pa. Super. 2018) (reiterating that the uncorroborated testimony of the complaining witness is sufficient to convict a defendant of a sexual offense).

In any event, the trial court determined that A.T.'s testimony that she did not consent to having sex with Rodriguez, and that he raped her, was corroborated by: (1) her mother's testimony that she awoke to A.T. crying and screaming at Rodriguez to get away from her; (2) the prompt 911 call and recording in which A.T. reported that Rodriguez had tried to have sex with her by putting his penis into her vagina while she was sleeping; and (3) A.T.'s DNA results. On this record, we discern no abuse of discretion by the trial

court in denying Rodriguez's weight challenge. Thus, we conclude that Rodriguez's issue is meritless and affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/14/2025