**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : IN THE SUPERIOR COURT OF |
| | :          PENNSYLVANIA |
| | : |
| v. | : |
| | : |
| | : |
| | : |
| ROBERT DANIEL O'TOOLE | : |
| | : |
| Appellant | :  No. 655 WDA 2025 |

Appeal from the Judgment of Sentence Entered April 7, 2025
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0003076-2024

BEFORE:  LAZARUS, P.J., BOWES, J., and LANE, J.

MEMORANDUM BY LANE, J.:             **FILED: June 17, 2026**

Robert Daniel O'Toole ("O'Toole") appeals from the judgment of sentence imposed following his conviction for summary harassment.[1]  We affirm.

We glean the following factual history from the evidence and testimony presented at trial.  In March 2024, Rodney Boyers ("Boyers") received four voicemails "in a few days span" from an unknown phone number while he was working at Arrowood Independent Living.  N.T., 4/7/25, at 13.  These voicemails were generally lewd, vulgar, and homophobic in nature, and they addressed Boyers directly via his "work cell phone and [his] two work extensions[.]"  *Id*. at 7.  Although Boyers did not recognize the caller's phone number, he nonetheless believed the caller on each occasion to be O'Toole,

---

[1] *See* 18 Pa.C.S.A. § 2709(a)(3).

as he had worked with O'Toole on two theater productions, occurring in 2002 and 2013 respectively. Because these shows required "spending about two months with each other, three or four rehearsals a week," Boyers was "familiar with the speech patterns, style, inflection, tenor, [and] things like that[,]" making up O'Toole's "recognizable" and "distinct voice." *Id*. at 6, 8. Further substantiating this belief was the fact that the voicemail messages "repeatedly" addressed Boyers "using theater references." *Id*. at 7. As such, Boyers' experience with O'Toole at the theater alone allowed him to "immediately" identify O'Toole's voice over the phone. *Id*. at 8.[2] Accordingly, Boyers reported the four voicemail messages to police, who uncovered via search warrant that the phone number behind the voicemails belonged to an unidentifiable "subscriber" residing in the same zip code as O'Toole. *Id*. at 18. Police thereafter arrested O'Toole, and the Commonwealth initially charged him with misdemeanor counts of stalking and harassment.

On April 7, 2025, the matter proceeded to a non-jury trial, whereupon the Commonwealth amended the above charges to instead reflect two summary counts of harassment, as well as an additional summary count of

_____

[2] Although Boyers could identify O'Toole's voice "just from the rehearsal time that [he] spent with [O'Toole] and the two shows and performances[,]" he and O'Toole also had several mutual friends at the time, to the extent that he and O'Toole "were Facebook friends" and "acquaintances." N.T., 4/7/25, at 6. Accordingly, both he and O'Toole conversed with each other on multiple occasions outside of the theater during this period as well, whenever he would encounter O'Toole "working at a retail place or restaurant[.]" *Id*.

disorderly conduct. The Commonwealth then presented the testimony of both Boyers and the police officer assigned to investigate the incident, who each testified to the above series of facts, in addition to recordings of the four voicemails at-issue. Relevantly, when the Commonwealth played these recordings in court, Boyers expressed that each constituted one of the voicemails within which he had initially recognized O'Toole's voice. *See id*. at 10-12. Conversely, O'Toole testified thereafter that although he "[v]aguely" knew Boyers from the theater, he did not: (1) create nor send the voicemail messages at-issue; and (2) he did not know any of Boyers' phone numbers at the time, much less his place of employment. *Id*. at 21. At the conclusion of the trial, the trial court judge found O'Toole guilty of only one count of summary harassment, imposing a sentence of ninety days' probation that same day. O'Toole filed a post-sentence motion claiming that the trial court's verdict was against the weight of the evidence, and the trial court denied it. O'Toole subsequently filed a timely notice of appeal, and both he and the trial court complied with Pa.R.A.P. 1925.

O'Toole presents the following issue for our review: "Whether the trial court abused its discretion by not granting . . . O'Toole's post-sentence motion requesting a new trial based on the weight of the evidence?" O'Toole's Brief at 7.

O'Toole's sole issue presents a challenge to the weight of the evidence supporting his conviction. As our Supreme Court has explained:

A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice."

*Commonwealth v. Widmer*, 744 A.2d 745, 751-52 (Pa. 2000) (citations and footnote omitted). "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa. Super. 2015) (brackets and citation omitted). Thus, in order for a defendant to prevail on a challenge to the weight of the evidence, "the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the trial court." *Id*. at 546 (citation omitted).

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence*. Because the trial judge has had the opportunity to hear and see

the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (citations omitted, emphasis in original).

O'Toole argues that his conviction for summary harassment was against the weight of the evidence, as "the totality of the evidence presented in this case was [so] contradictory, tenuous, and contrary to a verdict of guilt . . . that it shocks one's notion of justice to allow such a verdict to stand uncorrected." O'Toole's Brief at 18. O'Toole primarily maintains that the trial court's reliance on Boyers' identification of him as the author of the voicemails was improper, as he claims that Boyers never made such a specific identification on the record. While O'Toole acknowledges that Boyers generally testified "that he could recognize . . . O'Toole's voice on the phone, and that the voicemails in question were left by O'Toole[,]" he nonetheless emphasizes that Boyers failed to act in accordance with these statements when faced with the voicemails in open court. *Id*. at 19.

With respect to the first voicemail recording played, O'Toole submits that Boyers only stated "that the caller was a male" without providing "any additional information identifying who the male caller was." *Id*. at 20. Boyers avers that this "same lack of identification occurred" in response to the third

and fourth recordings, as well. *Id*. Moreover, in response to the second voicemail, O'Toole highlights that Boyers conceded "that the voice was unrecognizable to him[.]" *Id*. at 20 (original quotations and brackets omitted). O'Toole therefore argues that Boyers' inability to specifically identify his voice during the playback of any of these recordings colored Boyers' testimony as both "unclear and contradictory" to the extent it undermined Boyers' credibility as a witness. *Id*. at 21. Thus, O'Toole maintains the trial court improperly "placed significant weight" on Boyers' testimony despite its "various issues and shortcomings[.]" *Id*.

By contrast, O'Toole argues the trial court should have relied on "the considerable amount of evidence presented that" he did not send the at-issue voicemails. *Id*. at 21. O'Toole emphasizes that Boyers readily admitted to being "mere acquaintances" who had their last limited interaction eleven years prior while working together at the theater. *Id*. at 22. In this same vein, O'Toole avers that the Commonwealth "provided no reason why" O'Toole would contact Boyers in this fashion, "seemingly out of the blue" and over a decade later. *Id*. at 22-23. Furthermore, O'Toole points out that neither Boyers nor the investigating officer could link the phone number behind the voicemails to O'Toole. Accordingly, O'Toole insists that the trial court should have instead relied on his credible testimony that he did not leave the voicemails on Boyers' phone — especially given his testimony "that he did not even know . . . Boyers' work phone number[.]" *Id*. at 23. Consequently,

O'Toole contends that the trial court's decision to ignore this "significant amount of evidence" in favor of crediting Boyers' "unclear and contradictory" testimony constituted an abuse of discretion requiring the award of a new trial. *Id*.

The trial court determined that O'Toole's weight of the evidence claim was without merit, reasoning as follows:

> [O'Toole's] weight claim essentially challenges . . . Boyers' testimony identifying [him] as the person who left the four voicemails. [O'Toole] argues that this court should have accepted his own self-serving testimony rather than the testimony of . . . Boyers. Inasmuch as [O'Toole's] weight claim concedes that the evidence was sufficient to convict in this case[,] and the weight of the evidence claim cannot be based solely on a challenge to the court's credibility determinations, [O'Toole's] weight claim fails. Moreover, this court was well within its discretion to believe the testimony of . . . Boyer[s'] familiarity with [O'Toole's] voice. Additionally, the trial evidence presented by the Commonwealth . . . was credible, competent[,] and reliable[,] and [it] established every element of harassment. This court has reviewed the trial record and believes that the verdict does not shock any rational sense of justice and, therefore, the verdict was not against the weight of the evidence.

Trial Court Opinion, 8/12/25, at 3-4 (unnecessary capitalization omitted).

Based on our review, we discern no abuse of discretion by the trial court in denying O'Toole's challenge to the weight of the evidence. As explained above, this Court will give the gravest consideration to the findings and reasons advanced by the trial court judge when reviewing its determination as to whether the verdict is against the weight of the evidence. *See Clay*, 64 A.3d at 1055. Moreover, one of the least assailable reasons for denying a new

trial is the lower court's conviction that the verdict was not against the weight of the evidence. *See id*.

Here, O'Toole is essentially asking this Court to reweigh the evidence to accord no weight to Boyers' testimony simply because, upon listening to the voicemail recordings in court, Boyers did not specifically reaffirm that O'Toole was the individual speaking. This, we cannot do. *See Talbert*, 129 A.3d at 545 (holding that the weight to be accorded to the evidence and testimony presented at trial was exclusively for the fact-finder, which was free to believe all, part, or none of the evidence and testimony and to determine credibility). Rather, this Court's role is to review the exercise of discretion by the trial court in ruling on the weight claim. In this regard, we discern no abuse of such discretion.

Importantly, we note that the trial court judge determined that Boyers' guilty verdict did not shock her conscience. Additionally, we emphasize that O'Toole appears to mischaracterize Boyers' testimony to make it appear as if his failure to specifically identify O'Toole immediately after listening to each voicemail equates to his inability to recognize O'Toole's voice on the recordings altogether. However, the trial court clearly credited Boyers' testimony preceding the playback of the four voicemails, in that Boyers "immediately" identified O'Toole's "recognizable" and "distinct voice" upon his receipt of the messages due to his experience working with O'Toole at the theater. N.T., 4/7/25, at 8. Further, while it is true that Boyers did not specifically identify

O'Toole after the playback of each voicemail message in court, the trial court could nonetheless rely on O'Toole's in-court recognition of three of the four voicemails, as well as his certainty that each of the four recordings reflected a voicemail message that he previously testified as containing O'Toole's voice, to reach its verdict.

On this record, we discern no abuse of discretion by the trial court in denying O'Toole's challenge to the weight of the evidence supporting his conviction for summary harassment. **See Widmer**, 744 A.2d at 752 (instructing that "[a] new trial should not be granted because of a mere conflict in the testimony"); **see also Talbert**, 129 A.3d at 545. Accordingly, we hold that O'Toole's sole issue is meritless, and we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 06/17/2026